NICHOLAS A. BROWN (SBN 198210)
  brownn@gtlaw.com
STEPHANIE D. AHMAD (SBN 284080)
  ahmads@gtlaw.com
**GREENBERG TRAURIG, LLP**
4 Embarcadero Center, Suite 3000
San Francisco, CA 94111-5983
Telephone: 415.655.1271
Facsimile: 415.520.5609

Attorneys for Plaintiff Prolifiq Software Inc.

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PROLIFIQ SOFTWARE INC., an Oregon corporation,<br><br>Plaintiff,<br><br>v.<br><br>VEEVA SYSTEMS INC., a Delaware corporation,<br><br>Defendant. | Case No.: 3:13-CV-03644-SI<br><br>**PLAINTIFF PROLIFIQ SOFTWARE INC.'S OPENING CLAIM CONSTRUCTION BRIEF**<br><br>DATE: June 17, 2014<br>TIME: 10:00 a.m.<br>LOCATION: Courtroom 10<br><br>JUDGE: HON. SUSAN ILLSTON |

## **Table of Contents**

TABLE OF AUTHORITIES ................................................................................................. ii

I.     LEGAL PRINCIPLES ............................................................................................ 1

II.    PROLIFIQ'S INVENTIONS .................................................................................. 2

    A.  The '378 Patent – "Adaptive Electronic Messaging" ........................................ 2

    B.  The '556 Patent – "Electronic Message Management" .......................................4

III.   AGREED CLAIM TERMS ................................................................................... 8

IV.   DISPUTED CLAIM TERMS IN THE '556 PATENT........................................... 8

    A.  "Core Content Candidates" And "Core Content Selection" ............................... 8

        1.  A "core content candidate" specifies substance, not merely subject ............................ 9

        2.  "Core content candidate" should not be construed using the '556 patent's description of "requested content" ................................................................. 10

        3.  The "core-content selection" is made by the sender .................................................. 11

    B.  "Message Creation Specification" ..................................................................... 11

        1.  "Message creation specification" would be understood by an ordinary artisan .......... 12

        2.  Veeva's indefiniteness theory is procedurally untenable.............................................. 13

    C.  "Digital Content Elements".................................................................................. 14

        1.  The "digital content elements" must provide content .................................................. 14

        2.  The "digital content elements" need not be "media" objects....................................... 15

    D.  "Selected From A Corresponding Plurality Of Differently Versioned Digital Content Element Candidates".............................................................................16

    E.  "Message Adaptation Specification" .................................................................. 18

    F.  "Corresponding Number Of Differently Versioned Digital Content Element Candidates" ........................................................................................................20

V.    THE DISPUTED CLAIM TERMS IN THE '378 PATENT................................... 21

    A.  "Message Layer"................................................................................................. 21

    B.  "Message Adaptation Specification"................................................................... 22

    C.  "Message Adaptation Component"...................................................................... 22

    D.  "Digital Content Elements"................................................................................. 22

    E.  "A Plurality Of Differently Versioned Digital Content Element Candidates" .................. 23

VI.   CONCLUSION ...................................................................................................... 23

# TABLE OF AUTHORITIES

**Federal Cases**

*Agilent Techs., Inc. v. Affymetrix, Inc.*,
    567 F.3d 1366 (Fed. Cir. 2009) ............................................................................................. 11, 15

*Dealertrack, Inc. v. Huber*,
    674 F.3d 1315 (Fed. Cir. 2012) ..................................................................................................... 3

*Elcommerce.com, Inc. v. SAP AG*,
    745 F.3d 490 (Fed. Cir. 2014) ............................................................................................... 12, 14

*Kinetic Concepts, Inc. v. Blue Sky Medical Group, Inc.*,
    554 F. 3d 1010 (Fed. Cir. 2010) ..................................................................................................... 1

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ........................................................................... 1, 9, 21

*Primos, Inc. v. Hunter's Specialties, Inc.*,
    451 F.3d 841 (Fed. Cir. 2006) ............................................................................................... 10, 15

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
    659 F.3d 1376 (Fed. Cir. 2011) ............................................................................................. 12, 14

*Vederi, LLC v. Google, Inc.*,
    744 F.3d 1376 (Fed. Cir. 2014) ..................................................................................................... 3

Plaintiff Prolifiq Software Inc. ("Prolifiq") moves this Court for an order construing certain claim terms from the asserted claims[1] of U.S. Patent Nos. 8,296,378 ("'378 patent") and 7,634,556 ("'556 patent") (Ahmad Decl.[2] Exs. A & B, respectively). [3]

# I.    LEGAL PRINCIPLES

Prolifiq's discussion of claim construction begins by describing its inventions and their context, because claim construction must be performed based on "a full understanding of what the inventors actually invented and intended to envelop with the claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) (citations omitted). It is "fundamental" that claims are "to be read with a view to ascertaining the invention." *United States v. Adams*, 383 U.S. 39, 49 (1966). This principle is particularly important here, because as described in detail below, many of Veeva's claim construction proposals distort what Prolifiq's inventors actually invented.

Another principle important here is that the claims must be construed from the perspective of a person of ordinary skill in the art. *Phillips v. AWH*, 415 F.3d at 1313 ("The descriptions in patents are not addressed to the public generally, to lawyers or to judges, but, as section 112 says, to those skilled in the art to which the invention pertains")(*citing In re Nelson*, 47 C.C.P.A. 1031, 280 F.2d 172, 181 (1960)). This principle is particularly important to Veeva's argument that Prolifiq's claims are indefinite. The test for definiteness is "whether one skilled in the art would understand the bounds of the claim when read in light of the specification." *Kinetic Concepts, Inc. v. Blue Sky Medical Group, Inc.*, 554 F. 3d 1010, 1022 (Fed. Cir. 2010). To establish indefiniteness, Veeva must show by clear and convincing evidence that this test is not satisfied. *Id.* But Veeva has decided not to offer *any* evidence—let alone clear and convincing evidence—showing that a person of ordinary skill would not understand Prolifiq's claims. As a result, Veeva's indefiniteness position is untenable.

---

[1] Prolifiq is presently asserting claims 1-9 & 13-20 of the '556 patent and claims 1-2, 5-6, 8, 10-16, & 20-21 of the '378 patent against Veeva Systems, Inc. ("Veeva").

[2] "Ahmad Decl." refers to the Declaration of Stephanie Ahmad in Support of Plaintiff Prolifiq's Opening Claim Construction Brief, filed concurrently herewith. Citations to exhibits refer to exhibits identified in the Ahmad Declaration.

[3] Messrs. Marshall and Gaus were co-inventors for the '378 patent, but not the '556 patent.

## II.   PROLIFIQ'S INVENTIONS

Electronic messaging is a powerful communication tool. Extensive effort has been put into developing technology to use electronic messages for sales and marketing in the most effective ways possible. Prolifiq has been engaged in product-development work in this field for more than fifteen years, and the patents at issue here describe inventions Prolifiq developed as part of that work.

### A.   The '378 Patent – "Adaptive Electronic Messaging"

Early in Prolifiq's history, it developed technology used in promotional mass-email campaigns. For example, Prolifiq performed a number of email campaigns for the Venetian Hotel that successfully drove up attendance in the travel slump that followed the terrorist attacks of September 11, 2001.[4] During that stage of its history, Prolifiq's inventors recognized that then-existing technology for mass-email campaigns had many limitations, some of which related to the format of the message. Initially, email was sent in plain-text format, which had the advantage that recipients could read the messages no matter what email client program they used.[5] Later, HTML-formatted email was used. HTML formatting made possible richer and more engaging email, but also introduced a host of problems related to presenting email on different devices with different hardware, operating systems, email clients, etc.[6] The '378 patent—along with a set of related patents—teaches Prolifiq's solutions to these problems: messages that are able to present the richest experience possible on a particular device, without appearing garbled in situations when the receiving system is not equipped to display some or all of the multimedia aspects of the message.[7]

The inventions of the '378 patent allow generating and presenting an adaptive message containing multiple "layers," with each layer containing a version of the message. *See* '378 patent at

---

[4] *See generally* Ex. I.

[5] *See* '378 patent at 1:25-42.

[6] These problems were both important and challenging at the time. For example, the @media function was proposed in a draft specification for CSS 2.0 in 1998 as a solution for adapting HTML to the properties of the device displaying it. However, CSS 2.0 was not actually supported by browsers until more than a decade later: the Firefox browser added support for CSS 2.0 (then 2.1) in 2009. Ahmad Decl. ¶ 3. Similarly, Internet Explorer added support for @media queries with Internet Explorer 9 in 2011. Ahmad Decl. ¶ 4.

[7] *See* '378 patent at 1:50-53 (explaining that while "it might be desirable to send complex messages including multimedia components to recipients, not all recipients may be capable and/or authorized to receive or view such messages.").

4:56-5:4; Ex. C, U.S. Patent No. 7,966,374 ("'374 patent") at 2:21-45.[8] The '378 patent describes tools that transform a digital content element, such as a video, into a set of different "versions that utilize different kinds of media players (such as video players and animation players) or programs of other kinds; versions that consume different levels of recipient computer system resources such as bandwidth, computing power, or memory; etc." '374 patent at 2:35-39. The different versions of the content are then incorporated into different layers of the message optimized for specific recipient systems, which may have different message-display capabilities, different levels of available bandwidth, or may be associated with different user-preferences or located behind corporate firewalls blocking different types of content. *See* '378 patent at 4:22-32 (display capabilities and available bandwidth), 12:12-24 (firewalls).

Different layers of a message are illustrated shown by figures below:

|  |  |
|---|---|
| Fig. 10 (images only) | Fig. 13 (low-quality video) |

---

[8] The '378 patent incorporates by reference an earlier-filed application that issued as the '374 patent. That incorporated-by-reference disclosure (published as the '374 patent) is treated as if it was part of the disclosure of the '378 patent. *See Vederi, LLC v. Google, Inc.*, 744 F.3d 1376, 1379 & 1383 (Fed. Cir. 2014) (reversing claim construction based on the disclosure of a provisional application that was incorporated by reference into the specification); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1323 (Fed. Cir. 2012).



| Fig. 11 (FLASH animation) | Fig. 12 (high-quality video) |

The top right figure shows an example of an initial layer of a message, with no animation or video. The other figures show the initial layer replaced with other layers, e.g. the bottom left figure shows a layer containing an animation, which is "typically displayed on a recipient computer system on which a video media player is not available, but an animation player is, or a recipient computer system on which a limited amount of bandwidth of available." '374 patent at Figs. 10-13 & 7:56-8:21.

### B.     The '556 Patent – "Electronic Message Management"

During the years that followed Prolifiq's invention of the adaptive-messaging technology described above, Prolifiq's inventors identified further limitations of the existing tools for electronic messaging. In late 2004, Prolifiq filed a provisional application that added to the disclosure of the '378 patent. By this timeframe, many tools had been developed to assist in preparing and sending both electronic messages generally, and mass-marketing emails specifically. The mass-email products of the time had developed many powerful features, including the ability to provide polished, rich-media messages and messages with individually-customized content. For example, one 2005 product made it "easy to create and send unlimited volumes of personalized, targeted emails,"

providing tools for the user to "modify image-rich templates or create your own."[9] However, even with these improvements and advantages, mass email remained less effective than a one-to-one message from a sales representative—particularly if that one-to-one message was received by the potential customer as a continuation of an existing conversation about a potential purchase. On the other hand, one-to-one messages from individuals were time-consuming for those individuals to create and send, and their content was not centrally controlled: even when starting from a corporate message-template and/or attaching a corporate brochure, the individual sending the message was the one with editorial control over the message being sent.[10] This lack of central control was a particular concern in heavily-regulated industries, such as the pharmaceutical industry.

The invention of the '556 patent addressed these problems, marrying "the interests of marketing" with "the priorities of sales." Ex. F, Provisional App. No. 60/633,832 ("'832 provisional") at FH556_000188 (incorporated by reference into the '556 patent, *see* '556 patent at 1:5-16). It did so by making it possible to separate the "sales" function of contacting individual customers from the "marketing" function of generating promotional content and ensuring that delivery of that content complies with corporate policies on branding, regulatory-compliance, or the like. Prolifiq's invention provided a system where individual sales representatives are the ones who trigger sending marketing messages by identifying specific content that should be sent to specific recipients. At the same time, the content of the message is centrally managed, improving efficiency and ensuring control.

---

[9] Ex. G, '556 Patent FH at FH556_000070-71 ("CForce" article).

[10] '556 patent at 1:27-34 ("Traditional efforts utilizing electronic communications involve a user assembling content and distributing content to selected recipients.").

Our solution maries the **interests of marketing and OP's** with the **priorities of sales**.

'832 provisional at FH556_000188. As shown by the image above, this central management allows control of branding, content, and regulatory compliance—for example through use of rules about how, when, and by whom particular content may be sent. *See also* '556 patent at 9:63-10:16. Central management also provides control over message templates used to send the content. But even with all this central management, individuals remain the ones who identify specific recipients, who select the content to be sent to those recipients, and who trigger sending the message with that content.[11]

To accomplish all of this, the '556 patent explains that a central computer sends to a user's device a 'menu' showing the content available to be sent.[12] A user can then trigger delivery of a

---

[11] A further advantage of this approach is that it allows individuals to efficiently trigger rich-media messages from a "thin-client" such as a smartphone. '556 patent at 4:43-44; *see also* '832 provisional at FH556_000188-202.

[12] *See* '556 patent at 5:60-65 ("the MCC 228 may query the message manager 108 for population of the requested content information field 308, including, for example, the current core-content candidates 312. The requested content information field 308 may be customized based at least in part on user credentials …"); *see also* Fig. 3, 5:46-53 ("core-content candidates 312 may be presented to the user … through a pull-down menu"); 2:52-60.

message by selecting the desired content and identifying a recipient.[13] The user's device transmits the content selection and recipient information to the central computer, which constructs a message to the recipient based on the requested content.[14] Finally, the central computer sends this message—aptly described as a "derived message"—to the recipient.[15]

The claims of the '556 patent describe this process. Each of the independent claims in the '556 patent can be summarized as involving four steps:

    (1)    A computer transmits "a plurality of core-content candidates" to a sender's device;

    (2)    The computer receives from the sender "an identification of a recipient" and "a core-content selection";

    (3)    The computer then identifies a "message creation specification," and "based on" the message creation specification, constructs a message to the recipient that includes "one or more digital content elements associated with the core-content selection";

    (4)    The computer transmits the message to the recipient.

Claim 1 of the '556 patent is reproduced below, with numbers added that correspond to the steps summarized above, and bold text showing the disputed terms:

> 1. In a computing system, a method of operation comprising:
>
> (1)    transmitting, by the computing system to a first network device associated with a sender, a plurality of **core-content candidates** for selection, each of the plurality of core-content candidates being associated with a product and/or service;

---

[13] *See* '556 patent at Fig. 3, 5:32-38 ("FIG. 3 illustrates an example of a user interface 300 … [which] may include a recipient information field 304 and a requested content information field 308, values for which may be input by an operator"); 5:46-53 ("The requested content information field 308 may provide a user with a selection of core-content candidates 312 … for which the message manager 108 may have access to the associated content. The core-content candidates 312 may be presented to the user … through a pull-down menu").

[14] *See* '556 patent at 3:8-12 ("the message manager 108 may receive the message construct 120 from the sending device 104, including identification of the recipient and requested content information, and generate an electronic message 124 according to a message generation specification"); *see also* 6:36-44; 7:63-8:7; '556 patent FH at FH556_000100 ("a sending device may send a relatively simple message construct that is used by the computing system in the construction of a relatively more complex electronic message that includes digital content elements associated with a core content selection.").

[15] *See* '556 patent at 3:12-20 ("As used herein the electronic message 124 may also be referred to as derived message 124 as its formation is at least partly derived from the message construct 120.").

(2)    receiving, by the computing system from the first network device via a first electronic message, a message construct with construct information to be used in construction of a second electronic message, the construct information including an identification of a recipient and requested content information that includes a **core content selection** selected from the plurality of core-content candidates;

identifying a **message creation specification**;

(3)    accessing, by the computing system from a source other than the first network device, one or more **digital content elements** associated with the core content selection;

constructing the second electronic message to include the one or more digital content elements, based at least in part on the message creation specification and the first electronic message; and

(4)    transmitting the second electronic message to a second network device associated with the recipient.

The disputed terms are discussed in Section V below in the order in which they appear.

## III.    AGREED CLAIM TERMS

The constructions agreed on by the parties can be found on page 1 of the Joint Claim Construction Statement. D.E. 47.

## IV.    DISPUTED CLAIM TERMS IN THE '556 PATENT

### A.    "Core Content Candidates" And "Core Content Selection"

| Term | Prolifiq's Proposed Construction | Veeva's Proposed Construction |
|---|---|---|
| Core-Content Candidates *(all claims of '556 patent)* | data that specifies, to the sender, the substance of an electronic message that can be created by the system/apparatus | optional subjects, each of which is directly related to information that the recipient is, or may be, interested in |
| Core-content selection *(all claims of '556 patent)* | A core-content candidate selected by the sender | Plain and ordinary meaning |

There are three primary disputes about these terms. The first dispute is whether a "core-content candidate" specifies "the substance" of a message or just its "subject." The second is whether "core content candidate" should be construed based on the language in the '556 patent describing a

different term—"requested content"—as "information that the recipient is, or may be, interested in." The third dispute is whether the "core-content selection" is made by the sender.

In the invention, the "core-content candidates" are sent from the central computer to the user in order to provide the user with what amounts to a 'menu' of messages that the system can send. In each of the claims, "a plurality of core-content candidates" is transmitted to a sender's device and a "core-content selection" is made from amongst those candidates. The message to the recipient is then constructed to include "digital content elements associated with the core-content selection." '556 patent at claims 1, 15, and 18. In this context, "core-content candidates" is properly construed as "data that specifies, to the sender, the substance of an electronic message that can be created by the system/apparatus."

### 1.    A "core content candidate" specifies substance, not merely subject

Veeva's position that "core-content candidates" are merely "optional *subjects*" is inconsistent with both the claim language and the written description of the invention. *Phillips v. AWH*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) (proper claim constructions "stay[] true to the claim language and most naturally align[] with the patent's description of the invention"). The claim contains the word "content," not the word "subject." These two words mean different things. "Content" denotes "the sum or substance of what is contained in a document." Ex. J at PV_00012364.[16] "Subject" is different: while the "subject" of a message may sometimes specify its substance, it often will not. For example, two editorials on the subject of "climate change" could be virtually opposite in substance— and if you wanted to send a message about climate change, you would want to know what kind of editorial you were sending, not just that its subject was "climate change." Thus, the context of the invention as a whole—where a "core content candidate" selected by the sender is used by a computer to generate and then send a message—shows that Veeva's use of "subjects" in its proposed construction is inappropriate. Confirming this, the phrase "optional subjects" does not appear anywhere in the '556 patent.

---

[16] Veeva identified a similar definition of content: "essential meaning or significance." Ex. K at VEEVA00001371.

### 2.   "Core content candidate" should not be construed using the '556 patent's description of "requested content"

The second dispute is about Veeva's proposal that each "core-content candidate" must be "directly related to information that the recipient is, or may be, interested in." Veeva's proposal is incorrect because it is based on statements made in the '556 patent about <u>different terms</u>. *Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 847-48 (Fed. Cir. 2006).

In the invention, the "core content candidates" are sent from the central computer to the sender's device. The sender's device then sends back a "message construct," containing the sender's "identification of a recipient" and "requested content" to the central computer. The '556 patent explains that the "requested content" is "content that the recipient <u>is, or may be, interested in.</u>" '556 patent at 2:52-62 (emphasis added). This makes sense, because "requested content" is the content that the sender has requested to be sent to the recipient. '556 patent at 5:56-52. The '556 patent then states:

> Requested content information <u>directly related</u> to the requested content could include, e.g., a request for information on a particular product and/or service (hereinafter collectively referred to as "core content").

'556 patent at 2:64-67. Veeva's proposed construction combines the phrase "directly related" from this statement about "core content" with the phrase "content that the recipient is, or may be, interested in" from the previously-quoted statement about "requested content."

The problem is that neither of these statements is actually about the term "core content *candidate.*" Rather, both are about "requested content." But there is <u>no</u> "requested content" at the time that the "core-content *candidates*" are transmitted to the sender. Indeed, the claims state expressly that "core-content candidates" are "<u>for selection.</u>" It is only after the sender selects one of the core-content candidates that the claims refer to "requested content information," which "includes a core-content selection selected from the plurality of core-content candidates." '556 patent at claim 1. It would be improper to construe "core content candidates" using the statements made about a different term.

In more practical terms, the problem with this aspect of Veeva's proposal is that it seems to require a prescient computer: even though the "core content candidates" are transmitted to the sender

before the recipient is identified, all of those candidates would have to be something "that the recipient is, or may be, interested in." That does not make sense. *Agilent Techs., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1377 (Fed. Cir. 2009) (reversing a construction of "closed chamber" because it "makes little sense" in the context of the system described in the specification and claims). What does make sense is what the '556 patent actually explains: that the "information that the recipient is or may be interested in" is the content that the sender has requested to be sent to the recipient.

### 3. The "core-content selection" is made by the sender

As described above in multiple places, the '556 patent makes clear that the "core-content selection" is the core-content candidate that is selected by the sender. The claims confirm this, reciting that the core-content selection is "selected from the plurality of core-content candidates" that were transmitted "to a first network device associated with a sender." Prolifiq is not certain it understands Veeva's objection to this construction. On the one hand, Prolifiq believes that construction should not be necessary for a jury to understand this term once "core-content candidate" has been construed. On the other hand, Prolifiq believes that any future argument by Veeva that the "selection" is made some other way would be improper as a matter of law, *i.e.* claim construction.

### B. "Message Creation Specification"

| Term | Prolifiq's Proposed Construction | Veeva's Proposed Construction |
|---|---|---|
| Message creation specification (all claims of '556 patent) | A specification for automated creation of an electronic message | Indefinite |

The only dispute about "message creation specification" is whether the term can be understood. Veeva's position that this claim term is indefinite is both substantively wrong and procedurally untenable.

Substantively, "message creation specification" is not indefinite because it would be readily understood by a person of skill in the art as being the specification used by the claimed computer system to construct an electronic message based on the sender's "core content selection" and

"identification of a recipient." *See, e.g.*, '556 patent at claim 1 ("constructing the second electronic message … based at least in part on the message creation specification").

Procedurally, Veeva's position is untenable because Veeva has not offered any evidence that "message creation specification" would not be understood by a person of ordinary skill in the art. This fatally underlines Veeva's ability to overcome the presumption of validity with clear and convincing evidence that a person of ordinary skill in the art would fail to understand the claim. *Elcommerce.com, Inc. v. SAP AG*, 745 F.3d 490, 503 & 506 (Fed. Cir. 2014) (reversing a finding of indefiniteness because "no evidence of the understanding and knowledge of persons of skill in the field" was presented); *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1379 (Fed. Cir. 2011) (reversing a finding of indefiniteness where there was "no evidence that a programmer of ordinary skill in the field would not understand" the contested term).

### 1.   "Message creation specification" would be understood by an ordinary artisan

The claim language shows that the "message-creation specification" is the specification that is used by the claimed computer system to construct an electronic message based on the sender's "core content selection" and "identification of a recipient." *See, e.g.*, '556 patent at claim 1 ("constructing the second electronic message … based at least in part on the message creation specification"). The '556 patent confirms that the "message creation specification" is used by the computer when it generates the message that is sent to the recipient:

> The message generation specification may direct the generation of the electronic message 124 through providing associations between requested content information, received from the sending device 104, and message templates and content controlled and accessible by the message manager 108.

'556 patent at 3:12-17.[17]

The '556 patent's use of the term "specification" is consistent with the ordinary and widespread use of the term in the technology industry. The "technical" definition of "specification" in the Oxford English Dictionary is: "A detailed description of the particulars of some projected work in building, engineering, or the like … together with directions to be followed by the builder." Ex. L at

---

[17] While this passage uses the phrase "message generation specification" instead of "message creation specification", there is no question in context that it is referring to the same thing.

PV_00012402.[18] Everyday examples of the use of "specification" in the technology industry, such as the specification for NTSC television signals, the WiFi (802.11) specification, and the HTTP specification, illustrate this definition: each of these specifications provides a detailed description of the particulars of something, whether it is a television signal, a wireless-data signal, or a world-wide-web page. *See generally* Ex. N at PV_00015369-15375 (NTSC Television Specification); Ex. O at PV_00012411-12414 (802.11 Wireless Specification); Ex. P at PV_00015204-15210 (HTTP Specification). The dictionaries Veeva cites show the same thing.[19]

Furthermore, Veeva itself has proposed that "message adaptation <u>specification</u>" should be construed as a "<u>mapping</u> of the ways in which the form or content of a message will be added to, subtracted from, or substituted for." D.E. 47 at 4 (emphasis added). This shows that Veeva is able to understand what a "specification" is.

In short, "message creation specification" is not indefinite. Like the various technical specifications that are known in the field, and like the "message adaptation specification" described in the '556 patent, the message-creation specification provides a 'mapping' from specific recipient and requested-content information to a constructed message.[20] Thus, Veeva's position should be rejected and Prolifiq's proposed construction should be adopted.

### 2.     Veeva's indefiniteness theory is procedurally untenable

As explained above, Veeva bears the burden of proving indefiniteness by clear and convincing evidence. But Veeva has not offered any testimony that a person of ordinary skill in the art would fail to understand the claim. The only evidence Veeva cites are portions of the '556 patent

---

[18] *See also* Ex. M at PV_00012410 ("an act of describing or identifying something precisely or of stating a precise requirement").

[19] Ex. Q at VEEVA00001360 (Microsoft Computer Dictionary: "A detailed description of something"); Ex. R, at VEEVA00001385 (Webster's Third New International Dictionary: "a detailed, precise, explicit presentation (as by enumeration, description, or working drawing) of something or a plan or proposal for something"; "a written or printed description of constructional work to be done").

[20] *See, e.g.*, '556 patent at 7:63-8:7 and 8:21-31 (describing construction of a message with the requested content elements and the message template suitable for delivery of those content elements); *see also id.* at 8:44-9:58 (describing the message adaptation specification, which may be integrated with the message creation specification); 9:63-10:16 (describing rule-check operations that may be incorporated with the message creation specification).

and dictionaries, and those things cannot provide clear and convincing evidence that an ordinary artisan would be unable to understand what "message creation specification" means. *Elcommerce.com, Inc.*, 745 F.3d at 506; *Typhoon Touch Techs.*, 659 F.3d at 1385.

C.      "Digital Content Elements"

| Term | Prolifiq's Proposed Construction | Veeva's Proposed Construction |
|------|--------------------------------|------------------------------|
| Digital content elements (all claims) | digital elements, such as text, data, image, audio, video, links, etc., that when viewed by the recipient, convey substantive information about a product or service | media object, such as text, data, image, audio, video, links, etc. |

There are two disputes about "digital content element." The first is whether a "digital content element" must provide <u>content</u>, *i.e.* substantive information, or whether any media object (e.g. a separator line) is sufficient. The second is whether a "digital content element" must be a "media" object.

In the invention, the "digital content elements" are the actual content that is included in the message constructed by the central computer and sent to a recipient, based on the core content selection made by the sender. Thus, all of the claims require that "digital content elements associated with the core content selection" are included in the message constructed by the claimed computer system.

Both parties' definitions incorporate the '556 patent's explanation that this content "may include any number of digital content elements such as, not limited to text, data, image, audio, video, links, etc."

1.      The "digital content elements" must provide content

Veeva's proposed construction appears intended to read the term "content" out of the claim. As previously explained, in the context of the invention, the "digital content elements" associated with the sender's core-content selection are included in the message that the computer constructs and sends to the recipient. If it were enough to add some trivial formatting media object, such as separator

line, the claim element would be effectively meaningless. *See Agilent Techs., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1377-78 (Fed.Cir.2009) (rejecting construction that renders part of the claim term superfluous). Moreover, the '556 patent and its claims make clear that "digital content elements" are distinct from "message templates," which contain message-formatting information. *See, e.g.*, '556 patent at claim 6, claim 20; 8:21-31 (describing a "message template database" containing message templates that may be "suitable for delivery of the digital content element deemed to satisfy the requested content information"); *see Primos*, 451 F.3d at 847-48 (distinct terms should be given different meanings).

This is not to say that claimed "digital content elements" cannot contain any formatting information. The point is that the set of "digital content elements" that are "associated with the core content selection" and included in the computer-constructed message must contain content, not just formatting. Veeva's construction is wrong because it would be satisfied by a formatting object that contains no substantive content—a result that does not reflect what the invention is about.

### 2. The "digital content elements" need not be "media" objects

Veeva's proposed construction includes the phrase "media object." Prolifiq is not certain what Veeva intends this phrase to mean, as it does not appear in the '556 patent. What does appear in the '556 patent is a discussion showing that *both* "a <u>media</u> repository" and "a <u>document</u> repository" contain digital content elements. *See* '556 patent at 8:21-31 (describing "accessing the content component 516 to select the one or more digital content elements" and explaining that "content component 516 may include a document repository 532 having, e.g., text and/or binary elements, a media repository 536 having, e.g., audio and/or video elements"); *Primos*, 451 F.3d at 848 (explaining that a proper construction does not exclude a preferred embodiment). Thus, "digital content elements" should not be limited to "media" objects.

**D.** **"Selected From A Corresponding Plurality Of Differently Versioned Digital Content Element Candidates"**

| Term | Prolifiq's Proposed Construction | Veeva's Proposed Construction |
|---|---|---|
| Corresponding plurality (claims 3 & 17 of '556 patent) | Not indefinite<br>No construction necessary | Indefinite |
| Differently versioned (claims 3, 8, & 17 of '556 patent) | Not indefinite<br>No construction necessary | Indefinite |

Dependent claim 3 recites that "at least one of the one or more digital content elements is selected from a corresponding plurality of differently versioned digital content element[] candidates."[21] '556 patent at claim 3. Veeva contends that the phrase "corresponding plurality of differently versioned digital content element[] candidates" is indefinite because the phrase has two distinct terms—"corresponding plurality" and "differently versioned"—each of which is indefinite. As before, Veeva's indefiniteness position is both substantively wrong and procedurally untenable.

Substantively, Veeva is wrong because the '556 patent contains clear examples of a digital content element being "selected from a corresponding plurality of differently versioned digital content element candidates." The '556 patent incorporates by reference the '374 patent, which describes transforming a digital content element, such as a video, into a set of different "versions that utilize different kinds of media players (such as video players and animation players)" '374 patent at 2:33-37. These different versions of the digital content element can then be incorporated into different layers of the message, where the different layers are optimized for different recipient systems. *See* '374 patent at 2:21-30. The figures below show two different layers of a message, one with a high-quality video, and one with a FLASH version of the same video:

---

[21] Claims 3 and 17 contain the typographical error of an extra "s" in the phrase "differently versioned digital content element**s** candidates." Claim 8 contains the same phrase without the error: "differently versioned digital content element candidates."





| Fig. 11 (FLASH animation) | Fig. 12 (high-quality video) |

The FLASH version would "typically [be] displayed on a recipient computer system on which a video media player is not available, but an animation player is, or a recipient computer system on which a limited amount of bandwidth of available." '374 patent at 8:17-21. The high-quality video version would "typically [be] displayed on a recipient computer system on which a video media player is available, and a high amount of bandwidth is available." '374 patent at 8:36-38.

This is an example of a digital content element being "selected from a corresponding plurality of differently versioned digital content elements candidates." The "digital content element" is the FLASH video selected for the limited-bandwidth system, and the "plurality of differently versioned digital content candidates" that "correspond[s]" to it are the set of versions of that video that are optimized for different recipient systems, here the FLASH version and the high-quality version.[22]

The '556 patent confirms this with another example that explains how a "differently versioned" content element is used when a particular receiving device does not receive video:

> For example, in an embodiment, the cell 708 may be suitable for delivery of video element while the cell 712 may be suitable for an image element. If, in an embodiment, it is determined that the receiving device 112 is not to receive video messages, the cell 708 may be deactivated and a like-topic, but <u>differently versioned</u>, content element may alternatively be displayed in cell 712.

---

[22] As described in Section II.A above, the written description actually contains examples of two additional versions (four total) that are not re-created here.

'556 patent at 10:36-42 (emphasis added).

Further confirmation is provided by the following description of choosing between "alternatively versioned content element candidates" in order to adapt a particular message to the capabilities of the receiving device:

> In some embodiments, the derived message 124 may be dynamically adapted after transmission to the receiving device 112. For example, the derived message 124 may be transmitted with alternatively versioned content element candidates 528 programmed to respond by activating the appropriate version based on capabilities/preferences at the receiving device 112.

'556 patent at 9:32-38.

Veeva's position that a person of ordinary skill would not be able to understand the claims in light of these examples and descriptions is just wrong. Veeva's indefiniteness position ignores the '556 patent's description of the invention and artificially separates the claim into distinct phrases. When the claim is read as a whole—as the law requires—its meaning is readily understood.

### E.   "Message Adaptation Specification"

| Term | Prolifiq's Proposed Construction | Veeva's Proposed Construction |
|---|---|---|
| Message adaptation specification (claims 3, 4, 8, 9, and 17) | A specification for automated definition of presentation alternatives for a given adaptive electronic message" | mapping of the ways in which the form or content of a message will be added to, subtracted from, or substituted for |

Several dependent claims require "identifying a message adaptation specification" and using it to adapt the electronic message by selecting a digital content element from amongst the "differently versioned digital content element candidates" discussed above. For example, claim 8 recites:

8. The method of claim 1, further comprising:

identifying a **message adaptation specification** for adapting the second electronic message; and

selecting, based at least in part upon the **message adaptation specification**, the one or more digital content elements from a corresponding number of differently versioned digital content element candidates.

1    '556 patent at claim 8 (emphasis added); *see also* claims 3, 4, 9, and 17.

2         Despite using almost entirely different words, the parties' proposed constructions of "message

3    adaptation specification" are similar in substance. Prolifiq's primary concern with Veeva's proposed

4    construction is with its use of the phrase "form or content." As the claim language makes clear,

5    adapting a message is different from creating a message. Prolifiq's concern with Veeva's

6    construction is that it suggests otherwise by saying that the "form or content … will be [changed]".

7    Relatedly, both the claims and the specification of the '556 patent show that the "message adaptation

8    specification" is used to adapt a particular message that has been created based on the sender's core-

9    content selection. Thus, to the extent Veeva's construction suggests that the message adaptation

10   specification is used to change the substance of the constructed message, it is incorrect.

11        Admittedly, Veeva's construction also refers to the "form or content of a message," which

12   seems to confirm that it is describing modification of a particular message. Nonetheless, Veeva's

13   construction is unnecessarily confusing. The '556 patent explains that "message adaptation

14   specification **540** may include a message layer definition to define alternative presentations or layers

15   for a given derivative electronic message." '556 patent at 8:49-52. It elaborates on how this is done:

16   "the derived message 124 may include one or more content cells that may be adapted to include a

17   version of one or more digital content elements selected from the digital content element candidates

18   528 as may be appropriate for a given message presentation." *Id.* at 8:54-58. Prolifiq's proposed

19   construction is drawn directly from this description, as well as the repeated consistent descriptions

20   found throughout the incorporated '378 patent[23]: the message adaptation specification defines

21   different "alternative presentations" of a given electronic message. Using the concept of "alternative

22   presentations" in the construction avoids the confusion created by Veeva's proposal.

23        Prolifiq and Veeva's proposed constructions differ in two other ways. First, Veeva replaces

24   the word "specification" with "mapping." While the word "mapping" seems to be a reasonable

25   approximation of the word "specification" in this context, there is no need to change the actual word

26

---

27   [23] *See, e.g.*, '378 patent at 5:5-10 and Fig. 2 (describing an "embodiment of message adaptation
     specification 106 including message layer definition 120 and decision logic 130. As shown, layer
28   definition 120 includes specifications for three layers (layer 1, layer 2, and layer 3), each defining an
     alternative presentation for at least one content cell of an adaptive electronic message.").

used in the claim, as described above it is more clear on its own. Second, Prolifiq's proposal includes the word "automated" to ensure there is no confusion that the "message adaptation specification" is used by a computer. While Veeva's proposed construction omits this word, there can be no dispute that both the claims and the description in the patent show that the specification is used by the claimed computer.

In sum, while Prolifiq and Veeva's proposed constructions for this term are similar in substance, Prolifiq's construction should be adopted because Veeva's proposal creates unnecessary confusion, and because Prolifiq's is more directly tied to the '556 patent's description of the invention.

**F.**     **"Corresponding Number Of Differently Versioned Digital Content Element Candidates"**

| Term | Prolifiq's Proposed Construction | Veeva's Proposed Construction |
|---|---|---|
| Corresponding number (claim 8 of '556 patent) | Not indefinite<br>No construction necessary | Indefinite |
| Differently versioned (claims 3, 8, & 17 of '556 patent) | Not indefinite<br>No construction necessary | Indefinite |

Except in using the word "number" instead of "plurality," this phrase is identical to the phrase "corresponding plurality of differently versioned digital content element[] candidates" that is discussed above. The issues are also identical. Veeva argues that the phrase's component parts are indefinite, and Veeva is wrong for the same reasons described above.

# V. THE DISPUTED CLAIM TERMS IN THE '378 PATENT

## A. "Message Layer"

| Term | Prolifiq's Proposed Construction | Veeva's Proposed Construction |
|---|---|---|
| Message layer<br><br>(all claims of '378 patent & claim 14 of '556 patent) | A presentation alternative for a given adaptive electronic message | presentation linking and/or embedding one or more media objects |

The parties' disputes regarding "message layer" are related to the disputes regarding "message adaptation specification." As described above in the context of that term, the '378 patent repeatedly uses the concept of "presentation alternatives" to describe what is meant by "message layers." *See, e.g.*, '378 patent at 4:37-41 (describing "alternative presentations or layers for a given adaptive electronic message"); 5:7-15 (describing "three layers" as "each defining an alternative presentation for at least one content cell of an adaptive electronic message"). Prolifiq's proposed construction is correct because it explains the claim term in the same way that the patent does.

In contrast, Veeva's construction is flawed because (1) it uses "presentation" instead of "presentation alternative," and (2) it adds the requirement of "linking and/or embedding one or more media objects." Dropping "alternative" from "presentation alternative" changes its meaning in a way that moves it away from what the patent describes. Similarly, adding the "linking or embedding" requirement improperly excludes the possibility of a having a base message layer in plain-text, or in HTML without any linked or embedded media. That possibility is expressly described in the '378 patent. *See* '378 patent at 3:50-53("a base electronic message comprising only text elements may be supplemented with one or more digital content elements"); *see also* 2:64-67; 3:45-63; 5:48-59; 6:18-22. Thus, Veeva's proposal should be rejected. *See Phillips*, 415 F.3d at 1312-1317) ("a court's primary focus should be on the intrinsic evidence of record, *viz.*, the claims, the specification, and, if in evidence, the prosecution history").

**B.    "Message Adaptation Specification"**

| Term | Prolifiq's Proposed Construction | Veeva's Proposed Construction |
|------|----------------------------------|-------------------------------|
| Message adaptation specification (all claims of '378 patent) | A specification for automated definition of presentation alternatives for a given adaptive electronic message" | mapping of the ways in which the form or content of a message will be added to, subtracted from, or substituted for |

This term is discussed above in the context of the '556 patent. The parties appear to agree that it should be construed the same way in both patents.

**C.    "Message Adaptation Component"**

| Term | Prolifiq's Proposed Construction | Veeva's Proposed Construction |
|------|----------------------------------|-------------------------------|
| Message adaptation component (all claims of '378 patent) | programming logic implementing (a) message adaptation specification(s) | programming logic designed to add to, subtract from, or substitute for the form or content of a message |

The dispute about this term appears to be subsumed by the dispute about the term "message adaptation specification," *i.e.* the parties appear to agree that the "message adaptation component" is programming logic implementing message adaptation, but disagree about what that means.

**D.    "Digital Content Elements"**

| Term | Prolifiq's Proposed Construction | Veeva's Proposed Construction |
|------|----------------------------------|-------------------------------|
| Digital content elements (all claims) | digital elements, such as text, data, image, audio, video, links, etc., that when viewed by the recipient, convey substantive information about a product or service | media object, such as text, data, image, audio, video, links, etc. |

This term is discussed above in the context of the '556 patent. The parties appear to agree that it should be construed the same way in both patents.

**E.**     **"A Plurality Of Differently Versioned Digital Content Element Candidates"**

| Term | Prolifiq's Proposed Construction | Veeva's Proposed Construction |
|---|---|---|
| Differently versioned (claim 13 of '378 patent) | Not indefinite<br>No construction necessary | Indefinite |

This term is discussed above in the context of the '556 patent. As far as Prolifiq is aware, Veeva's indefiniteness argument is the same as to both patents. Thus, it should be rejected here for the same reasons that are discussed above.

**VI.   CONCLUSION**

For the reasons stated herein, Prolifiq's proposed constructions should be adopted.

Dated:  May 19, 2014                                   GREENBERG TRAURIG, LLP


By:     /s/ Nicholas A. Brown

NICHOLAS A. BROWN
  brownn@gtlaw.com
STEPHANIE D. AHMAD
  ahmads@gtlaw.com
**GREENBERG TRAURIG, LLP**
4 Embarcadero Center, Suite 3000
San Francisco, CA 94111-5983
Telephone: 415.655.1271
Facsimile: 415.520.5609

*Attorneys for Plaintiff Prolifiq Software Inc.*