NICHOLAS A. BROWN (SBN 198210)
  brownn@gtlaw.com
SARAH BARROWS (SBN 253278)
  barrows@gtlaw.com
STEPHEN ULLMER (SBN 277537)
  ullmers@gtlaw.com
STEPHANIE D. AHMAD (SBN 284080)
  ahmads@gtlaw.com
**GREENBERG TRAURIG, LLP**
4 Embarcadero Center, Suite 3000
San Francisco, CA 94111-5983
Telephone: 415.655.1271
Facsimile: 415.520.5609

Attorneys for Plaintiff Prolifiq Software Inc.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PROLIFIQ SOFTWARE INC., an Oregon corporation, <br><br> Plaintiff, <br><br> v. <br><br> VEEVA SYSTEMS INC., a Delaware corporation, <br><br> Defendant. | Case No.: 3:13-CV-03644-SI <br><br> **PLAINTIFF PROLIFIQ SOFTWARE INC.'S REPLY CLAIM CONSTRUCTION BRIEF** <br><br> DATE: June 17, 2014 <br> TIME: 10:00 a.m. <br> LOCATION: Courtroom 10 <br><br> JUDGE: HON. SUSAN ILLSTON |

**Table of Contents**

TABLE OF AUTHORITIES .................................................................................................................ii

I.    DISPUTED CLAIM TERMS IN THE '556 PATENT............................................................. 1

    A. "Core Content Candidates" ................................................................................................1

       1. The "core content candidates" do not need to be "directly related to information that the recipient is, or may be, interested in." .................................................................. 1

       2. "Core content candidates" specify the "substance," not just the "subject" of the message that is to be sent to the recipient. ........................................................................ 2

    B. "Core Content Selection" ....................................................................................................4

    C. "Digital Content Elements" .................................................................................................4

       1. The term "content" in "digital content element" cannot be ignored. ............................ 5

       2. A "digital element" is not necessarily a "media object." .............................................. 6

    D. "Selected From A Corresponding Plurality Of Differently Versioned Digital Content Element Candidates" ..................................................................................................7

       1. "Corresponding" is not indefinite. ................................................................................ 8

       2. "Differently versioned" is not indefinite. ..................................................................... 8

    E. "Message Creation Specification" .....................................................................................10

    F. "Message Adaptation Specification" .................................................................................13

II.   THE DISPUTED CLAIM TERMS IN THE '378 PATENT................................................... 14

    A. "Message Layer" ...............................................................................................................14

    B. "Message Adaptation Component" ...................................................................................15

    C. "Digital Content Elements" ...............................................................................................15

    D. "A Plurality Of Differently Versioned Digital Content Element Candidates" ...................15

III. CONCLUSION ..................................................................................................................... 15

# TABLE OF AUTHORITIES

**Federal Cases**

*Ancora Techs., Inc. v. Apple Inc.*,
 744 F.3d 732 (Fed. Cir. 2014) .................................................................................... 3, 5, 7

*Bancorp Services, L.L.C. v. Hartford Life Ins. Co.*,
 359 F.3d 1367 (Fed. Cir. 2004) ...................................................................................... 10, 11

*Datamize, LLC v. Plumtree Software, Inc.*,
 417 F.3d 1342 (Fed. Cir. 2005) ......................................................................................... 9, 10

*IGT v. Bally Gaming Int'l, Inc.*,
 659 F.3d 1109 (Fed. Cir. 2011) .................................................................................................. 5

*Nautilus, v. Biosig Instruments, Inc.*,
 No. 13-369, slip op. at 12 (June 2, 2014) ............................................................... 7, 10, 11

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*,
 806 F.2d 1465 (Fed. Cir. 1986) ................................................................................................ 13

*Pause Tech., LLC v. TiVo, Inc.*,
 419 F.3d 1326 (Fed. Cir. 2005) .................................................................................................. 7

*Phillips v. AWH Corp.*,
 415 F.3d 1303 (Fed. Cir. 2005) (en banc) ........................................................... 3, 4, 6, 7

*Thorner v. Sony Computer Ent. Am. LLC*,
 669 F.3d 1362 (Fed. Cir. 2012) ............................................................................................ 3, 5

Plaintiff Prolifiq Software Inc. ("Prolifiq") submits this reply brief in support of its proposed constructions of the disputed claim terms from the asserted claims[1] of U.S. Patent Nos. 8,296,378 ("'378 patent") and 7,634,556 ("'556 patent") (Ahmad Decl.[2] Exs. A & B, respectively).

## I. DISPUTED CLAIM TERMS IN THE '556 PATENT

### A. "Core Content Candidates"

The parties agree that the claims of the '556 patent share a common structure where a computer transmits a set of "core-content candidates" to a network device associated with a sender, and the sender's device then "returns information reflecting (1) the intended recipient of the electronic message, and (2) a selection from among the 'core-content candidates.'" Veeva's Claim Construction Brief ("Veeva Br.") at 3-4; '556 patent at claims 1, 15, 18. The computer then generates an electronic message to the identified recipient that includes content elements associated with the selection that was made from among the "core-content candidates" initially transmitted to the sender's device. *Id.* Thus, the parties agree that "core-content candidates" are "options presented to the user," whose use is "fundamental to the invention's approach to targeting information to particular recipients." Veeva Br. at 16 & 14. However, the parties disagree in two significant ways.

#### 1. The "core content candidates" do not need to be "directly related to information that the recipient is, or may be, interested in."

Veeva argues incorrectly that "core content candidates" must be "directly related to information that the recipient is, or may be, interested in." Veeva's argument is based entirely on a passage in the '556 patent that describes two *different* terms: "requested content" and "core content." Veeva Br. at 14-15 (citing the '556 patent at 2:55-60; 2:64-3:5). As Prolifiq explained in its opening brief, the '556 patent and its claims use "core content" in two contexts: "core content candidates," and "core content selection." The "candidates" are transmitted by the computer to the sender, and the "selection" is transmitted by the sender back to the computer. The passage that Veeva relies on

---

[1] Prolifiq is presently asserting claims 1-9 & 13-20 of the '556 patent and claims 1-2, 5-6, 8, 10-16, & 20-21 of the '378 patent against Veeva Systems, Inc. ("Veeva").

[2] "Ahmad Decl." refers to D.E. 57, the May 19, 2014 Declaration of Stephanie Ahmad in Support of Plaintiff Prolifiq's Opening Claim Construction Brief ("Opening Br."). Citations to exhibits refer to exhibits identified in the Ahmad Declaration.

describes information being sent by the sender to the computer, and is about the "selection," not the "candidates."

The flaw in Veeva's argument is demonstrated by its assertion that "it is clear that 'requested content'—and thus 'core content'—is 'requested *by the recipient*,'" as opposed to the sender. Veeva Br. at 15. This assertion is contradicted by the claim language, as well as by multiple passages in the specification. The claims specifically state that the "requested content information" is sent from the sender's device to the computer. *See* '556 patent at claims 1, 15, 18 ("receiving … an identification of a recipient and requested content information that includes a core content selection"). Similarly, the specification contains multiple passages showing that the "requested content information" identifies content that the sender asks the computer to send to the recipient. *See, e.g.*, '556 patent at 5:46-47 ("The user 35 interface **300** may include a recipient information field **304** and a <u>requested content information field</u> **308,** values for which may be <u>input by an operator.</u>"); 3:12-17 ("The message generation specification may direct the generation of the electronic message through providing associations between <u>requested content information, received from the sending device</u> 104, and message templates and content controlled and accessible by the message manager.") (emphasis added).

Veeva's construction does not make sense in the context of the claim, because it would require the candidates, which are transmitted to the sender <u>before</u> the recipient is identified, to nonetheless be related to "information that the recipient is, or may be, interested in." The '556 patent explains that the "core content <u>selection</u>"—which the sender uses to request that particular content be sent to a recipient—is information that the recipient may be interested in. Veeva's brief does not respond to this point.

  **2.**  **"Core content candidates" specify the "substance," not just the "subject" of the message that is to be sent to the recipient.**

Veeva also argues that "core content candidates" are merely "subjects." The word "content" does not mean "subject." Veeva does not explain how its construction can be squared with the claim

language.³ Instead, Veeva incorrectly suggests that Prolifiq's proposal relies "solely" on dictionary definitions. In fact, the dictionary definitions of "content" echo the distinction the '556 patent draws between the "content" of messages and the "format," "presentation," or "template" of messages. For example Figure 5 distinguishes between a "content component" and a "message template database." Similarly, Figure 6 identifies "select template" and "select content" as separate steps in generating a message. "Format definitions" and "content definitions" are described separately. '556 patent at 6:51-52. Further, the patent describes choosing between "alternative *presentations* or layers for a *given* derivative electronic message," based on the "content rendering capabilities" of recipient's device. '556 patent at 8:49-9:4 (emphasis added). It then provides a separate description of using "rules adapted to ensure that the derived message 124 contains proper *content*." '556 patent at 10:8-11 (emphasis added).

The distinction between content and form is repeated in the claims. *Cf.* claim 1 (constructing a message with "content elements associated with the core content selection"); claim 6 (adding to claim 1 limitations related to selecting "a message template").⁴

Veeva's argument that the term "content" should be changed to "subject" is based on a single sentence in the specification: "The core-content candidates 312 may be selected from a list of, for example, products and/or services, for which the message manager 108 may have access to the associated content." Veeva Br. at 16. A single example in the specification is not sufficient to justify changing the claim language from "content" to "subject."⁵ Moreover, the single passage cited by

---

³ "It is unjust to the public, as well as an evasion of the law, to construe [a claim] in a manner different from the plain import of its terms." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citations omitted).

⁴ Because the term "content" is used in the '556 patent in accordance with its commonly-understood meaning, and not in some specialized technical sense, it is entirely appropriate to consult a general purpose dictionary to assist in understanding that meaning. *See Phillips*, 415 F.3d at 1314; *id.* at 1322 (dictionaries are appropriately consulted "at any time" so long as they do not contradict the meaning "ascertained by a reading of the patent documents.")

⁵ *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (explaining that deviation from the ordinary meaning of "attached" was not appropriate, and that it would only be appropriate if the patentee acted as her own lexicographer or disavowed the full scope of the claim in the specification or prosecution history); *see Ancora Techs., Inc. v. Apple Inc.*, 744 F.3d 732, 735 (Fed. Cir. 2014) (refusing to construe the term "program" based on non-limiting examples in the written description)

Veeva does not actually imply that "candidates" are mere "subjects." In some scenarios, a selection from a list of products is something that specifies the substance of a message: a used-car salesperson in a business that generated a single flyer for each of the cars in its inventory could be presented with a list of those cars, and that might well specify the substance of the message that would go out attaching the flyer for that car.

In sum, Veeva's arguments fall well short of showing that "core content candidate" should be construed to require any more, or any less, than the ordinary meaning of that phrase in the context of the claims.

### B. "Core Content Selection"

The parties dispute whether the "core content selection" is made by "the sender."[6] Someone or something must select a core-content candidate, and the claim language shows that someone or something is the "sender." The specification confirms this. *See* '556 patent at 5:35-38 ("The user interface 300 may include … a requested content information field 308, values for which may be input by an operator using one or more input devices.").

### C. "Digital Content Elements"

The parties agree that digital content elements are things "such as text, data, image, audio, video, links, etc." However, as the briefs show, that agreement does not go very far, because being on the agreed list is neither necessary nor sufficient to be a "digital content element" under either party's definition.

There are two disputes about "digital content elements": whether they must provide content, and whether they must be "media objects." Veeva's proposed construction first reads the term "content" out of the phrase, and then replaces "digital elements" with "media object." Veeva's construction is improper on both counts because there is insufficient support for making either of these changes to the claim language.[7]

---

[6] It is not clear to Prolifiq at this stage of the case whether or not this particular dispute actually needs resolution: Prolifiq is not aware of any relevant issue where it would make a difference.

[7] *See Phillips*, 415 F.3d at 1316 (explaining that the specification "may reveal a special definition" or "an intentional disclaimer, or disavowal, of claim scope" that justifies changing the meaning of a claim term).

### 1. The term "content" in "digital content element" cannot be ignored.

Veeva does not explain how its construction gives any meaning to the term "content." Veeva's construction would include things like images of a line or bullet point that could not be considered "content." *See* Opening Br. at 9 & 14-15. That makes Veeva's construction fatally overbroad.

Instead of addressing this problem, Veeva accuses Prolifiq of adding a "substantive information" limitation to the claim with "no evidentiary basis." Veeva Br. at 7. But the concept of "substantive information" is what the word "content" means: "the sum or substance of what is contained in a document." Ex. J at PV_00012364. Moreover, as explained above, the '556 patent conveys exactly the same meaning when it repeatedly distinguishes between the "content" of messages and the "format," "presentation," or "template" of messages. The context provided by the claim language as a whole further confirms the importance of the word "content": "digital content elements" are "associated with the core content selection," which in turn is was chosen from a list of "core content candidates" that are each "associated with a product and/or service." '556 patent at claims 1, 15, 18; *see also id.* at 3:16-24 (explaining that messages generated by the invention include "content controlled . . . by the message manager," and that this "content may include any number of digital content elements"). The word "content" cannot simply be ignored.

Veeva's brief shows that its position is based solely on a single sentence in the '556 and '378 patents that describes digital content elements as including various types of "links or other user interface controls." Veeva Br. at 7. Veeva argues that this sentence shows that digital content elements need not convey "any substantive information," because the described links and interface controls do not convey substantive information. *Id.*

Veeva cannot read the word "content" out of the claim based on a single sentence that provides non-limiting examples. *IGT v. Bally Gaming Int'l, Inc.*, 659 F.3d 1109, 1118 (Fed. Cir. 2011) (finding the claim term "predetermined" retained its plain and ordinary meaning and was not altered by examples in the written description); *see also Thorner*, 669 F.3d at 1365; *Ancora Techs*, 744 F.3d at 735. Veeva is not interpreting the sentence correctly, because the three examples of a "link" or "control" that it describes *would* convey substantive information.

The examples in this sentence do not discard the notion of "content" (i.e. "substance"). '556 patent at 3:24-28. The sentence's first example is a control that enables the recipient of the message "to obtain further information." That option would be meaningless if substantive information were not conveyed to the recipient in response. The second example is a control that enables the recipient to forward the message—which conveys the substance of the original message to the person who receives the forwarded content. *Id.* The third example is an opt-out control that allows the recipient to state that he or she does not want to receive similar messages in the future. This control, like the first, would be meaningless if there were no substantive information conveyed by the message. *Id.*

Moreover, the specification as a whole shows that the digital content elements must convey content for the invention to make sense. Veeva's construction should be rejected because it violates the cardinal principle that claim construction be performed with "a full understanding of what the inventors actually invented and intended to envelop with the claim." *Phillips*, 415 F.3d at 1316.

### 2. A "digital element" is not necessarily a "media object."

Veeva's brief also fails to justify adding the word "media" to the construction of "digital content element." Veeva does not explain why the "media" limitation is necessary. Nor does Veeva provide any fair explanation for why content must be "media" when the patent describes both a "media repository" and a "document repository" as parts of the "content component." Its construction includes "text" as an example, but as pointed out above being included on the list of examples is neither necessary nor sufficient to satisfy Veeva's construction. Thus, Veeva's inclusion of "text" as an example has no effect on the scope of its construction: Veeva could argue later that *any* particular text was not a "digital content element" because it was not a "media object."

Notably, the sentence from the '378 patent that Veeva relies on for its "media object" position does not mention "text elements"—which are described later as alternatives to "video" and "image" elements.[8] It would be improper to use that single sentence to limit the claims to "media objects." *See*

---

[8] *See, e.g.*, '378 patent at 6:6-13 ("[F]ive presentation cells are shown with each cell being associated with a different type of content element. For example, cell 1 may be designated to display HTML-based content elements, cell 2 may be designated to display image-based content elements, cell 3 may be designated to display text-based content elements, and cell 4 may be designated to display video-based content elements.")

*Ancora Techs.*, 744 F.3d at 735 (reversing a construction of "program" that narrowed its ordinary meaning to application programs).

### D. "Selected From A Corresponding Plurality Of Differently Versioned Digital Content Element Candidates"

Several of Prolifiq's claims require selecting a digital content element "from a corresponding plurality of differently versioned digital content element candidates."[9] Veeva argues that the phrases "corresponding plurality" and "differently versioned" are indefinite, because "the claims offer no clue as to what is required to correspond to what," and because there is "no objective standard" for determining when two digital content elements are different versions of each other. Veeva's Br. at 8. Veeva is wrong on both counts.

To begin with, the claim language has a meaning that is apparent from the ordinary English meaning of its words: a digital content element is selected "from a corresponding plurality of differently versioned digital content element candidates" when one content element is selected from a set of content-element candidates that are different versions of each other.[10] That ordinary meaning is consistent with, and confirmed by, the disclosure of the '556 and '378 patents.[11] *See* Opening Br. at 16-17 & 3-4 (describing, *e.g.*, high and low bandwidth versions of a video). The claim language is not indefinite because it informs "those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, v. Biosig Instruments, Inc.*, No. 13-369, slip op. at 12 (June 2, 2014).

---

[9] Claim 8 of the '556 patent uses the phrase "from a corresponding *number* of differently versioned digital content element candidates" but Veeva does not argue that the use of "number" instead of "plurality" makes the issues any different.

[10] Veeva repeatedly accuses Prolifiq of "hiding" the component terms of this phrase by citing it as whole, suggesting that it is somehow inappropriate for Prolifiq to point out the context in which they are used in the claims. That suggestion is wrong: "the context in which a term is used in the asserted claim can be highly instructive," and "provides a firm basis for construing the term." *Phillips*, 415 F.3d at 1314; *see also Pause Tech., LLC v. TiVo, Inc.*, 419 F.3d 1326, 1331 (Fed. Cir. 2005) (rejecting Pause's argument that other portions of the claim language should be ignored when interpreting the claim element at issue).

[11] The '556 patent is a continuation-in-part of the application that became the '378 patent, and incorporates by reference the disclosure of the '378 patent.

### 1. "Corresponding" is not indefinite.

Veeva argues that Prolifiq's explanation is not enough to avoid indefiniteness because it "renders the "corresponding" terms entirely superfluous." Veeva Br. at 19. However, the word corresponding is not superfluous because it shows that the set of "differently versioned content element candidates" matches up to the "digital content element" that is added to the message in the independent claim. Thus, "corresponding" is not indefinite.

### 2. "Differently versioned" is not indefinite.

Veeva also argues that Prolifiq's explanation is not enough to avoid indefiniteness because there is "no objective standard" in the patents for determining when two digital content elements are different versions of each other. Veeva Br. at 8. This argument fails both because "an objective standard" is not required in the way that Veeva suggests, and because the patents do provide objective standards that delineate the scope of the claims with "reasonable certainty."

First, the claims that require selecting "from a corresponding plurality of differently versioned digital content element candidates" provide informative context when they are read as a whole—context that resolves the confusion that Veeva seeks to create by asking whether a video advertising Budweiser and a billboard advertising Coors are "different versions of content relating to beer." Veeva Br. at 8. All the claims share a common structure where a message is constructed and sent based on "an identification of a recipient" and a "core content selection" received from the sender. Importantly, the constructed message includes a digital content element that is "associated with" the "core content selection," which in turn must be "associated with a product and/or service."[12] This context shows that the claimed "corresponding plurality of differently versioned digital content element candidates" are all associated with the core content selection made by the sender, and thus in turn with "a product and/or service." This context explains Veeva's Budweiser/Coors example by showing that it could not occur while satisfying the other claim limitations. Budweiser and Coors are different products, and a "core content selection" could not be associated with both a Budweiser

---

[12] Each "core content candidate" is "associated with a product and/or service", and the "core content selection" is made "from" the set of candidates.

video and a Coors billboard at the same time. In other words, the meaning of "core-content selection" informs the scope of "differently versioned" by showing that each version must be useable in place of the others in a message that conveys the substance identified by the sender's core-content selection.[13]

In fact, the Budweiser/Coors example underscores the problem with Veeva's argument that a "core content candidate" designates merely "subject." Veeva is certainly correct that Budweiser and Coors advertisements both relate to the *subject* "beer,"—but it is hard to see how it makes any sense for a salesman to identify his customer Joe, select "beer", and press send without knowing whether the resulting message to Joe will be about Budweiser or Coors. Veeva's effort to change the claim language into something that does not make sense is improper.

Turning to the specification the patents provide examples of what it means for elements to be "differently versioned." Opening Br. at 16-18. In addition, the patents confirm the reasoning set forth above regarding the meaning of the claim language. *See supra* Section I.A.2. (describing the distinction the '556 patent draws between the "content" of messages and the "format," "presentation," or "template" of messages). Veeva points out that there is a sentence in the specification which refers to substituting "*like-topic*, but differently versioned, content element[s]" when adapting a message. Veeva argues that this sentence contradicts "Prolifiq's requirement of identical content with different formatting." Rather, it shows that differently-versioned content elements are elements that convey the same substance but are typically formatted differently.[14]

Finally, Veeva's "no objective standard" argument misinterprets the law. Veeva's argument is based on *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342 (Fed. Cir. 2005), where claims that required "the look and feel of interface screens" to be "aesthetically pleasing" were invalidated because "the scope of claim language cannot depend solely on the unrestrained, subjective opinion of a particular individual purportedly practicing the invention." *Id.* at 1350. The Federal Circuit considered the ordinary meaning of the term, the context in which it was used in the claims, the

---

[13] The claims further confirm this by showing that the selection between "differently versioned digital content element candidates" is done as part of the process of *adapting* a message using the "message adaptation specification."

[14] Prolifiq is not arguing that differently versioned content elements must have "identical content."

specification, and the file history, and found that none of them provided a person of ordinary skill in the art "with any way to determine whether an interface screen is 'aesthetically pleasing.'"[15] Veeva is wrong to suggest that this unusual case created a requirement that patents set forth an "objective standard" for evaluating whether each of their claim terms is met.

Thus, Veeva's indefiniteness argument should be rejected. The patents provide substantial guidance about what it means for a digital content element to be "selected from a corresponding plurality/number of differently versioned digital content element candidates." That guidance is more than sufficient, particularly in light of the Supreme Court's explanation that the law requires "reasonable certainty" about claim scope, not absolute certainty. *See Nautilus*, No. 13-369, slip op. at 11 (June 2, 2014). Moreover, as Prolifiq explained its opening brief, Veeva cannot carry its burden of proof without providing evidence showing that a person of ordinary skill would not understand the claims. Veeva's efforts to distinguish the cases establishing that principle are unavailing.

### E. "Message Creation Specification"

Veeva argues that "message creation specification" is indefinite because it "is presented as a black box that in some unidentified way assists in the construction of electronic messages." This argument should be rejected both because a "message creation specification" is not presented as a "black box," and because even if it were, it would not make the term indefinite.

The decision in *Bancorp Services, L.L.C. v. Hartford Life Ins. Co.,* 359 F.3d 1367 (Fed. Cir. 2004) is instructive. In *Bancorp*, the Federal Circuit reversed a finding that "surrender value protected investments" was indefinite even though: (1) the term was never used in the specification; (2) the district court credited testimony the term was not known and would not be understood in the relevant art; and (3) the term could only be understood by interpreting it to mean the same thing as a different term also used in the claims. *Id.* at 1370-71. It did so because "the components of the term

---

[15] The closest the patent came to describing the limits of "aesthetically pleasing" was a statement that the system could take "into account the considered opinions of aesthetic design specialists, database specialists, and academic studies." *Datamize*, 417 F.3d at 1352.

have well-recognized meanings, which allow the reader to infer the meaning the entire phrase with reasonable confidence." *Id.* at 1372.[16]

The circumstances here do far less to suggest indefiniteness than the circumstances in *Bancorp*. There is no testimony (or other evidence) that the term would not be understood.[17] The term is used repeatedly in the specification. And there is no claim differentiation problem with interpreting "message creation specification" in accordance with the ordinary meaning of its component words.

Far from being indefinite, the term "message creation specification" can be interpreted using the standard claim-construction inquiry. There is no real dispute that each of words in the phrase "message creation specification" has a meaning that would be understood. Veeva shows this both by conceding that "message adaptation specification" is not indefinite, and by expressly acknowledging that the word "specification" is not itself indefinite. Veeva Br. at 18, 10-14. Confirming this, Prolifiq provided multiple examples of well-known specifications, such as the HTTP specification. *See* Opening Br. at 13. Thus, as in *Bancorp*, the meaning of "message creation specification" can be ascertained based on the recognized meaning of each of its words: it is a specification, *e.g.* a "detailed description of the particulars of some projected work ... together with directions to be followed by the builder," used for creating a message.

The context of the claims provides additional and consistent guidance. For example, the claims show that the "message creation specification" uses particular input from the sender (the "identification of a recipient" and a "core content selection") in order to generate a message that contains a digital content element that is associated with the core content selection."

---

[16] Importantly, the express conclusion that one could "infer the meaning the entire phrase with reasonable confidence" shows that this determination is in accord with the standard just articulated by the Supreme Court in *Nautilus*, which asks whether the claims "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, No. 13-369, slip op. at 11 (June 2, 2014).

[17] The examiner is the only person approximating an ordinary artisan whose assessment of the claims is in evidence—and the examiner obviously did not believe the claims were indefinite. *See* Ex. E '556 File History at FH556_000080.

Similarly, the specification of the '556 patent provides additional and consistent descriptions of the "message creation specification." Far from treating it as a "black box," the '556 patent explains that it works by "providing associations between requested content information, received from the sending device 104, and message templates and content controlled and accessible by the message manager 108."[18] Veeva argues that this passage is not about the "message creation specification" because it uses the words "message generation specification" instead. Specifically, Veeva argues that because Prolifiq "failed to cite the quoted passage … in the parties' Joint Claim Construction Statement," the court should conclude that a person of ordinary skill in the art would not have recognized it as a being relevant to understanding "message creation specification." Veeva's Brief at 18. Putting aside the questionable logic of this argument, its premise is false. Prolifiq *did* cite this passage in the Joint Claim Construction Statement. ECF No. 47 at p. 3 (citing '556 patent at 3:8-20). More importantly, the concepts of "message generation" and "message creation" are used interchangeably throughout the specification and claims.[19] That shows that a person of ordinary skill in the art *would* recognize the "message generation specification" described at 3:8-20 as being the "message creation specification" of the claims.

In short, contrary to Veeva's indefiniteness argument, the "message creation specification" is a term that can be understood in terms of what it is (a detailed description of particulars, together with directions), how it works (by providing associations between core content selections and the message templates and content controlled by the message manager), and what it does (use particular inputs to

---

[18] '556 patent at 3:12-17; *see also* '556 patent at 8:11-14 (message creation specification can apply rules for selecting the delivery channel for the message); 8:21-40 (describing obtaining "the digital content associated with the requested content information value" and then forming the message by linking or embedding that content in a message template).

[19] *See, e.g.*, 3:12-13 ("The message generation specification may direct the generation of the electronic message 124"); 4:4-5 ("Following creation of the derived message 124, the message manager 108 may then forward it to the receiving device"); 8:1-2 ("To generate the derived message 124 the message creation component 512 …"); 7:65-8:1 ("The message creation component 512 … may operate to generate the derived message 124 according to the message creation specification 420."); 8:7-14 ("In the generation of the derived message 124, the message creation component 512 may also select the delivery channel … [T]he selection of the delivery channel may be determined … through the message creation specification 420"); Claim 15 ("generate a second electronic message … based at least in part on the message creation specification").

generate a message with particular characteristics). Veeva's indefiniteness complaint is quite similar to the complaint that the Federal Circuit rejected in *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1465 (Fed. Cir. 1986). There, the invention was a collapsible pediatric wheelchair that could be used to get children in and out of automobiles. There was no dispute that the specific meaning of the term at issue—and thus the scope of the claim—varied depending on the type of automobile the wheelchair used with. But as the Federal Circuit explained, because the "claims were intended to cover the use of the invention with various types of automobiles," the fact that "a particular chair on which the claims read may fit within some automobiles and not others is of no moment." Here, the "message creation specification" is intended to cover the use of the invention with a variety of different types of message. As in *Orthokinetics*, Veeva's indefiniteness complaint improperly asks the '556 patent to be more precise than its subject matter permits.

### F. "Message Adaptation Specification"

Adapting a message is fundamentally different from creating a message. As both patents show, message adaptation involves choosing between alternative presentations of an existing message, as opposed to creating a new message. Veeva's construction destroys this important distinction.

Prolifiq's construction is taken directly from the specification: the "message adaptation specification 50 may include a message layer definition to define alternative presentations or layers for a given derivative electronic message." '556 at 8:49-52. The '556 patent goes on to describe how these "alternative presentations" can be implemented. *See* '378 patent at 5:5-10 and Fig. 2 (describing a "message adaptation specification" as including "specifications for three layers … each defining an alternative presentation for at least one content cell of an adaptive electronic message.").

Veeva argues that message adaptation can include adaptation of content, not just form. *See* Veeva Br. at 11-12. In support, Veeva identifies passages that describe adapting a message to a particular recipient by adding, e.g., the user's name or personalized "thank you." *Id.* Veeva argues that these passages are inconsistent with Prolifiq's construction. But these modifications adapt an existing message; they do not convert it into a different message with different "substance." Thus, they are consistent with Prolifiq's proposed construction. In other words, the personalized messages

mentioned are plainly described as "alternative presentations" of a message corresponding to a particular core content selection. *See, e.g.*, '556 patent at 8:49-52; '378 patent at 5:5-10 and Fig. 2.

Veeva's other examples confuse the issues. For example, Veeva is wrong to suggest that Prolifiq's construction does not account for the selection among presentation alternatives when the term "specification" certainly encompasses the decision logic example that Veeva suggests is missing. *See* Veeva Br. at 13. Indeed, the claim language itself demonstrates this. *See, e.g.*, '378 patent at claim 1 (requiring "decision logic" as part of the message adaptation specification). Similarly, Veeva argues that "presentation alternative" and "alternative presentation" have different meanings. If any difference exists, it was not intended by Prolifiq. Thus, to moot this argument (without agreeing with it), Prolifiq agrees to revise its proposed construction to refer to "alternative presentations" instead of "presentation alternatives."

## II. THE DISPUTED CLAIM TERMS IN THE '378 PATENT

### A. "Message Layer"

The '378 patent repeatedly and consistently explains that "message layers" provide "alternative presentations" of a given electronic message. *See, e.g.*, '378 patent at claim 1, 4:37-41. By omitting the word "alternative" from its proposed construction, Veeva changes the term's meaning in a way that appears intended to allow the layers in a single message to have unrelated content. That does not make sense. The concept that layers provide "alternatives" for a particular message needs to be reflected in the construction.

Veeva complains that Prolifiq's "presentation alternative" proposal means something different from the "alternative presentation" language actually used in the patent. *See* Veeva Br. at 13. That was not intended. *See supra* Section I.F. Though Prolifiq does not agree with Veeva's argument, the issue is moot because Prolifiq agrees to revise its proposed construction to read "An alternative presentation…."

Finally, Veeva's explanation for the "linking and/or embedding" limitation it seeks to add to the definition of message layer is insufficient to justify importing the limitation from the specification. As described in Prolifiq's Opening Brief, Veeva's construction would improperly exclude embodiments with text-only layers that are described in the patents. Veeva's effort to save its

construction by arguing that "plain text" is a "media object" is inconsistent with both the ordinary meaning of "media" and the specification. It would defeat the purpose of claim construction to adopt a construction that can only be squared with disclosure of the patent by reinterpreting the words in the construction in an unusual and unconventional way.

### B. "Message Adaptation Component"

The arguments Veeva raises in support of its construction of this term are subsumed in the parties' respective arguments regarding the "message adaptation specification" term. *See supra* Section I.F; Opening Br. at 22; Veeva Br. at 20-21.

### C. "Digital Content Elements"

*See supra* Section I.C.

### D. "A Plurality Of Differently Versioned Digital Content Element Candidates"

*See supra* Section I.D.

## III. CONCLUSION

For the reasons stated herein and in Prolifiq's Opening Brief, Prolifiq's proposed constructions should be adopted.

Dated: June 9, 2014                  GREENBERG TRAURIG, LLP

By:    /s/ Nicholas A. Brown

NICHOLAS A. BROWN
  brownn@gtlaw.com
SARAH BARROWS
  barrows@gtlaw.com
STEPHEN ULLMER
  ullmers@gtlaw.com
STEPHANIE D. AHMAD
  ahmads@gtlaw.com
**GREENBERG TRAURIG, LLP**
4 Embarcadero Center, Suite 3000
San Francisco, CA 94111-5983
Telephone: 415.655.1271
Facsimile: 415.520.5609

*Attorneys for Plaintiff Prolifiq Software Inc.*