1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   PROLIFIQ SOFTWARE INC.,                    No. C 13-03644 SI

12              Plaintiff,                       **CLAIM CONSTRUCTION ORDER**

13       v.

14   VEEVA SYSTEMS INC.,

15              Defendant.
                                    _____/
16   _____

17          On June 17, 2014, the Court held a *Markman* hearing regarding the construction of disputed

18   claim terms in U.S. Patent Nos. 7,634,556 and 8,296,378 owned by the plaintiff.  Having considered the

19   arguments of counsel and the papers submitted, the Court construes the disputed claim terms as follows.

20

21                                **BACKGROUND**

22          The present matter involves a patent infringement action initiated by plaintiff Prolifiq Software

23   Inc. ("Prolifiq") against defendant Veeva Systems Inc. ("Veeva"), pertaining to U.S. Patent Nos.

24   7,634,556 ("the '556 patent") and 8,296,378 ("the '378 patent").  Currently, Prolifiq accuses Veeva of

25   infringing claims 1-9 and 13-20 of the '556 patent and claims 1-2, 5-6, 8, 10-16, and 20-21 of the '378

26   patent.  Docket No. 56 at 1 n.1.  By the present claim construction briefs, the parties request that the

27   Court construe eight disputed terms from the '556 patent and five disputed terms from the '378 patent,

28   with three disputed terms found in both of the patents.

*United States District Court*
For the Northern District of California

United States District Court
For the Northern District of California

The invention described in the '378 patent relates to the field of adaptive electronic messaging. '378 Patent at 1:21-23. The '378 patent states that in many situations it is desirable to send complex email messages containing several multimedia components to recipients rather than text only emails. *Id.* at 1:32-49. However, one problem with these complex messages is that "not all recipients may be capable and/or authorized to receive or view such messages." *Id.* at 1:50-53. The invention described in the '378 patent is aimed at solving this problem.

The '378 patent describes systems and methods for generating and supplementing adaptive electronic messages. '378 Patent at 2:44-47. These adaptive electronic messages may be supplemented either before or after delivery to the recipient, so that only certain digital elements out of a group of elements are displayed or presented depending on the preferences, capabilities, and/or configurations of the receiving computer/device or based on the identity of the recipient. *Id.* at 2:47-58. For example, one receiving device might be capable of only showing text, while a different receiving device is able to display video. The invention through the use of a message adaptation specification is able to send an electronic message that would only show text when displayed on the first device, but show text and video when displayed on the second device.

Claim 1 of the '378 patent is as follows:

1. In a computing system, a method of operation comprising:

identifying, by a message adaptation component of the computing system, a message adaptation specification that includes:

a message layer definition to indicate a first message layer and a second message layer corresponding to an adaptive electronic message, wherein the first message layer and the second message layer are respectively associated with a first digital content element and a second digital content element, and

decision logic to facilitate selection of the first message layer or the second message layer;

receiving, by the message adaptation component, a base electronic message;

selecting, by the message adaptation component based on the message adaptation specification, the first message layer for adapting the base electronic message;

accessing, by the message adaptation component, the first digital content element from a data store, wherein the first digital content element is accessible by the message adaptation component prior to said receiving of the base electronic message; and

adapting, by the message adaptation component, the base electronic message to include the first digital content element to form an adapted electronic message.

'378 Patent at 12:42-67.

The invention described in the '556 patent relates to the management and distribution of electronic messages. '556 Patent at 1:20-22. The '556 patent explains that "[t]raditional efforts utilizing electronic communications involve a user assembling content and distributing content to selected recipients." *Id.* at 1:27-30. The patent explains that this may be undesirable because "it requires significant resources to provide access and control of the content to be incorporated into the message, as well as human resources to direct the creation of the message." *Id.* at 1:31-34.

The '556 patent aims to create a better way of preparing and transmitting electronic messages containing certain content to selected recipients through the use of a message management system. *See* '556 Patent at 2:31-35. In this system, a message manager is coupled with a first network device associated with a sender. *See id.* at 2:42-43, 11:15-19. The message manager transmits to the first network device a plurality of core-content candidates—information related to products and/or services—for potential selection on the first network device. *See id.* at 2:66-67; 5:46-6:20, 11:15-19. The first network device then sends back to the message manager information about the recipient and the core-content candidates that have been selected. *See id.* at 2:52-3:7, 11:20-27. Based on the information received, the message manager through the use of a message creation specification generates a message and then sends the message to a second network device associated with the recipient. *See id.* at 3:8-20, 4:4-6, 11:28-37. In addition, similar to the teachings of the '378 patent, the invention described in the '556 patent allows for the message that is sent to the recipient to be adaptive to the preferences, capabilities, and/or configurations of the receiving computer/device or based on the identity of the recipient. *Id.* at 2:35-38, 8:49-9:38, 10:34-42.

Claim 1 of the '556 patent is as follows:

1. In a computing system, a method of operation comprising:

transmitting, by the computing system to a first network device associated with a sender, a plurality of core-content candidates for selection, each of the plurality of core-content candidates being associated with a product and/or service;

receiving, by the computing system from the first network device via a first electronic message, a message construct with construct information to be used in construction of a second electronic message, the construct information including an identification of a recipient and requested content information that includes a core content selection selected from the plurality of core-content candidates;

1    identifying a message creation specification;

2    accessing, by the computing system from a source other than the first network device, one or more digital content elements associated with the core content selection;

3

4    constructing the second electronic message to include the one or more digital content elements, based at least in part on the message creation specification and the first electronic message; and

5

6    transmitting the second electronic message to a second network device associated with the recipient.

7    '556 Patent at 11:13-37.

8

9    **LEGAL STANDARD**

10    Claim construction is a matter of law.  *Markman v. Westview Instr., Inc.*, 517 U.S. 370, 372

11    (1996).  Terms contained in claims are "generally given their ordinary and customary meaning."

12    *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).  "[T]he ordinary and customary

13    meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art

14    in question at the time of the invention."  *Id.* at 1312.  In determining the proper construction of a claim,

15    a court begins with the intrinsic evidence of record, consisting of the claim language, the patent

16    specification, and, if in evidence, the prosecution history.  *Id.* at 1313; *see also Vitronics Corp. v.*

17    *Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  "The appropriate starting point . . . is always

18    with the language of the asserted claim itself."  *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d

19    1182, 1186 (Fed. Cir. 1998); *see also Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir.

20    1997).

21    Accordingly, although claims speak to those skilled in the art, claim terms are construed in light

22    of their ordinary and accustomed meaning, unless examination of the specification, prosecution history,

23    and other claims indicates that the inventor intended otherwise.  *See Electro Medical Systems, S.A. v.*

24    *Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1053 (Fed. Cir. 1994).  While claims are interpreted in light

25    of the specification, this "does not mean that everything expressed in the specification must be read into

26    all the claims."  *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed. Cir. 1983).  For instance,

27    limitations from a preferred embodiment described in the specification generally should not be read into

28    the claim language.  *See Comark*, 156 F.3d at 1187.  However, it is a fundamental rule that "claims must

**United States District Court**
For the Northern District of California

4

be construed so as to be consistent with the specification." *Phillips*, 415 F.3d at 1316. Therefore, if the specification reveals an intentional disclaimer or disavowal of claim scope, the claims must be read consistently with that limitation. *Id.*

Finally, the Court may consider the prosecution history of the patent, if in evidence. *Markman*, 52 F.3d at 980. The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution. *See Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995). In most situations, analysis of this intrinsic evidence alone will resolve claim construction disputes. *See Vitronics*, 90 F.3d at 1583. Courts should not rely on extrinsic evidence in claim construction to contradict the meaning of claims discernable from examination of the claims, the written description, and the prosecution history. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583). However, it is entirely appropriate "for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Id.* Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317. All extrinsic evidence should be evaluated in light of the intrinsic evidence. *Id.* at 1319.

## DISCUSSION

**I.     Terms On Which The Parties Agree**

The parties agree on the constructions for the following three terms. Docket No. 47 at 1; Docket No. 56 at 8; Docket No. 67 at 5.

| Patent | Term | Construction |
|---|---|---|
| '556 patent | "message construct" | "data to be used in the creation of the second electronic message" |
| '556 patent | "message template" | "data that specifies the format of an electronic message" |
| '556 and '378 patents | "component" | "programming logic" |

United States District Court
For the Northern District of California

## II.    Disputed Terms Found In Both The '556 Patent And The '378 Patent

The following terms are found in both the '556 patent and the '378 patent.  The parties agree that the terms should be construed consistently between the two patents.  *See* Docket No. 56 at 22-23; Docket No. 67 at 6-14.

### A.    "digital content element(s)"

| Plaintiff Prolifiq | Defendant Veeva |
|---|---|
| "digital elements, such as text, data, image, audio, video, links, etc., that when viewed by the recipient, convey substantive information about a product or service" | "media object, such as text, data, image, audio, video, links, etc." |

The parties first dispute whether the "digital content element(s)" are limited to media.  Veeva argues that "digital content elements" are media.  Docket No. 67 at 6.  In support of this assertion, Veeva cites to the following sentence from the '378 patent's specification: "The term 'digital content elements', is intended to broadly refer to multimedia or rich media elements or objects, such as, but not limited to audio and video (including multi-frame video and still images), animations, clips, files and data streams."  '378 Patent at 3:36-40.  However, the very next sentence states: "Digital content elements <u>may also refer to</u> links or other user interface controls . . . ."  *Id.* at 3:40-41 (emphasis added); *see also* '556 Patent at 8:21-28, fig. 5 (explaining that the content component may include a document repository possessing text and/or binary elements and a media repository possessing audio and/or video elements).  Thus, the specification clearly states that the term "digital content element(s)" refers to more than just media.  Accordingly, the Court declines to limit the term "digital content element(s)" to media objects.

The parties next dispute whether the "digital content element(s)," when viewed, must convey the substantive information of the electronic message.[1]  At the hearing, Veeva conceded that digital

---

[1]    In its briefing, Prolifiq argues that the "digital content elements" must convey substantive information about a product or service.  Docket No. 56 at 14-15; Docket No. 70 at 5-6.  However, the term "digital content elements" is found in both patents, and Prolifiq argues that the term should construed consistently between the patents.  Although the '556 patent refers to information about products and services, the '378 patent does not.  *See generally* '378 Patent.  Indeed, the specification of the '378 patent does not even contain the word "product."  At the hearing, Prolifiq conceded that the

United States District Court
For the Northern District of California

content elements must convey information.[2]  However, Veeva contends that they need not convey the substantive information of the message.  The specifications for both patents state: "Digital content elements may also refer to links or other use interface controls designed to enable recipients to obtain further information about a message, to forward the message to another recipient, to request to not receive similar message in the future, and so forth."  '378 Patent at 3:40-44; '556 Patent at 3:24-29.  Here, the specifications provide examples of "digital content elements" that do not convey the substantive information of the electronic message.  "A claim construction that excludes the preferred embodiment 'is rarely, if ever, correct and would require highly persuasive evidentiary support.'" *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010).  In arguing that the "digital content elements" must convey substantive information, Prolifiq relies on dictionary definitions of the term content.  Docket No. 70 at 5 ("the word 'content' means: 'the sum or substance of what is contained in a document'").  However, extrinsic evidence cannot be used to vary, contradict, expand, or limit the claim language from how it is defined, even by implication, in the intrinsic record. *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 977-78 (Fed. Cir. 2014); *Bell Atl. Network Servs. v. Covad Commc'ns Grp.*, 262 F.3d 1258, 1269 (Fed. Cir. 2001).  Accordingly, the Court declines to require that the "digital content elements" convey the substantive information of the electronic message.

The parties agree that the Court's construction of this term should contain the '556 patent's explanation that "digital content element(s)" may be, but are not limited to, "text, data, image, audio, video," "links", etc.  '556 Patent at 3:22-24; *see also* '378 Patent at 3:36-40.  Accordingly, the Court construes "digital content element(s)" as "digital elements, such as text, data, image, audio, video, links, etc., that convey information."

---

'378 patent does not refer to products and services and stated that it was striking the words "about a product or service" from its proposed construction.

[2] Specifically, Veeva asserted that the digital content elements are media.  When asked to define what it meant by the word "media," Veeva stated that it would be anything that conveys information.

**United States District Court**
For the Northern District of California

B.      "differently versioned"

| Plaintiff Prolifiq | Defendant Veeva |
|---|---|
| Not indefinite; No construction necessary | Indefinite |

Veeva argues that this term renders asserted claims 13-16 the '378 patent and asserted claims 3, 4, and 8 of the '556 patent invalid for indefiniteness.  Docket No. 67 at 7-9.  Veeva argues that this term is indefinite because there is no objective standard for determining when two digital content elements are different versions of each other.  *Id.*  In response, Prolifiq argues that the claim term is not indefinite because the patents provide clear examples of differently versioned digital content elements. Docket No. 56 at 16-18.

Under 35 U.S.C. § 112, a patent's specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as [his or her] invention."  35 U.S.C. § 112 ¶ 2.  "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus, Inc. v. Biosig Instruments*, 134 S. Ct. 2120, 2124 (2014).  Indefiniteness must be proven by clear and convincing evidence.  *Id.* at 2130 n.10 (citing *Microsoft Corp. v. i4i Ltd. Partnership*, 131 S. Ct. 2238, 2242 (2011)); *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1368 (Fed. Cir. 2013).

In *Nautilus*, the Supreme Court explained that indefiniteness under section 112 requires a "'delicate balance.'"  134 S. Ct. at 2128.  "On the one hand, the definiteness requirement must take into account the inherent limitations of language.  Some modicum of uncertainty, the Court has recognized, is the 'price of ensuring the appropriate incentives for innovation.'"  *Id.*  "At the same time, a patent must be precise enough to afford clear notice of what is claimed, thereby "'appris[ing] the public of what is still open to them.'"  Otherwise there would be '[a] zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims.'"  *Id.* at 2129.  Thus, the definiteness requirement "mandates clarity, while recognizing that absolute precision is unattainable."  *Id.*

The Federal Circuit, in *Datamize, LLC v. Plumtree Software, Inc.*, held that "[t]he scope of claim language cannot depend solely on the unrestrained, subjective opinion of a particular individual purportedly practicing the invention.  Some objective standard must be provided in order to allow the

United States District Court
For the Northern District of California

public to determine the scope of the claimed invention." 417 F.3d 1342, 1350 (Fed. Cir. 2005) (citation omitted) (finding invalid for indefiniteness a patent that contained the claim term "aesthetically pleasing"). This is because "[r]eference to undefined [subjective] standards, regardless of whose views might influence the formation of those standards, fails to provide any direction to one skilled in the art attempting to determine the scope of the claimed invention." *Id.* at 1352. Although *Datamize* was determined under the pre-*Nautilus* standard for determining indefiniteness, the Court still finds the case instructive as its holding comports with the test for indefiniteness set forth in *Nautilus*. Indeed, claim language that fails to provide an objective standard for determining the scope of the invention and instead relies on the unrestrained, subjective opinion of the person practicing the invention would be language that fails to provide a person skilled in the art with reasonable certainty as to the scope of the invention.

Prolifiq argues that the patents provide clear examples of differently versioned digital content elements. Docket No. 56 at 16-18. The '556 Patent and the '378 Patent incorporate by reference the patent application that issued as U.S. Patent No. 7,966,374 ("the '374 patent"). '556 Patent at 9:55-58; '378 Patent at 1:5-17; *see Advanced Display Sys. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000) (explaining that a patent's specification can incorporate by reference material from a document making it so that the material effectively becomes part of the specification). The '374 patent discloses a software facility that "provides authoring tools for generating multiple versions, or 'layers' of an IP message to be delivered to one or more recipients, such as an email message, each layer optimized for display on recipient computer systems having different sets of digital content and other capabilities." '374 Patent at 2:21-26. The patent goes on to explain that the authoring tools perform this function by transforming received information:

> into a number of different layers, each of which contains different versions of the digital content elements(s) [*sic*] in the context of the specified environment. Such different versions of the digital content element(s) may include versions that utilize different kinds of media players (such as video players and animation players) or programs of other kinds; versions that consume different levels of recipient computer system resources such as bandwidth, computing power, or memory; etc.

*Id.* at 2:30-39. Consistent with this, claim 17 of the '378 patent, which is dependent on claim 13, describes a system with data stores "configured to store a plurality of differently versioned digital content element candidates including a first digital content element and second digital content element"

United States District Court
For the Northern District of California

"wherein the first digital content element is a video content element and the second digital content element is a flash content element." '378 Patent at 13:60-64, 14:51-53; *see also* '556 Patent at 10:34-42 ("[T]he cell 708 may be suitable for delivery of video element while the cell 712 may be suitable for an image element.  If, in an embodiment, it is determined that the receiving device 112 is not to receive video messages, the cell 708 may be deactivated and a like-topic, but differently versioned, content element may alternatively be displayed.").  Thus, the Court agrees with Prolifiq that the patents provide examples of "differently versioned" digital content elements, such as a video version of a digital content element as opposed to a flash version of a digital content element.

However, that the specifications provide these examples does not mean that the patents provide an objective standard for determining what is meant by the term "differently versioned."   For example, the claims in *Datamize* could not have been saved simply by providing examples in the specification of items that are "aesthetically pleasing," such as a rose or a sunset.  Providing examples of things that are generally considered "aesthetically pleasing" does not change the subjective nature of the term "aesthetically pleasing."  Moreover, to determine the scope of a claim, a person skilled in the art must know not only what falls inside the scope of the claim term, but also what falls outside of it.  This knowledge provides a person skilled in the art with the boundaries of the invention.  Indeed, to provide a person of skill in the art with the boundaries of the claims at issue, that person must know both when something is a differently versioned digital content element and when something is not a differently versioned digital content element.  Stating examples of differently versioned digital content elements only provides information about when something is a differently versioned digital content element, but it does not provide information about when something is not a differently versioned digital content element.  Thus, the examples do not necessarily provide information about what falls outside of the scope of the claims.

The only information contained in the specifications of the '374, '378, and '556 patents explaining the outer boundaries of the term "differently versioned" digital content elements is the '556

Patent's explanation that differently versioned digital content elements must be "like-topic."[3]  '556

Patent at 10:39-42 ("If, in an embodiment, it is determined that the receiving device 112 is not to receive

video messages, the cell 708 may be deactivated and a *like-topic, but differently versioned*, content

element may alternatively be displayed." (emphasis added)).  However, the problem with this is that the

term "like-topic" is often subjective.  As explained in the examples given by Veeva at the claim

construction hearing, one person could look at a digital image of a dog and a digital image of a cat and

reasonably conclude that these images are not "like-topic" and, thus, not "differently versioned" content

elements because dogs are different from cats.  But, another  person could look at the same two images

and just as reasonably conclude that the images are "like-topic" because they are both images of pets

and, thus, are different versions of pet images.  Therefore, the boundaries of the term "differently

versioned" in the context of the patents-in-suit will often depend on the unrestrained, subjective opinion

of the person practicing the invention, leaving the scope of the claims in a zone of uncertainty.

Prolifiq argues that this term is not indefinite because the claims require that the digital content

elements are related to a product and/or service, and, therefore, each version of the differently versioned

digital content elements must be related to a particular product or service.  Docket No. 70 at 8-9.  First,

the Court notes that this argument would only apply to the '556 patent, because as Prolifiq conceded

at the hearing, the invention described in the '378 patent is not limited to messages related to products

and/or services.  Second, even accepting Prolifiq's proposed interpretation of the claims, the added

limitation of being associated with a particular product or products still does not provide an objective

standard for determining whether two digital content elements are differently versioned or are simply

---

[3] In its briefing, Prolifiq appears to suggest that the patents provide an additional requirement for this term.  Prolifiq argues that the patents require that the digital content elements are "differently versioned" such that they are able to adapt to the capabilities of the receiving device.  Docket No. 56 at 17-18.  But, this is contradicted by the specification of the '556 patent which states that the "differently versioned" digital content elements may be selected based on the capabilities and/or preferences of the receiving device or the recipient.  '556 Patent at 2:35-38 ("[E]mbodiments of the present invention may provide for the adaptation of the form and/or content of the electronic message based on capabilities and/or preferences associated with the message recipient."), 10:34-36 ("[T]he cells may be customized based at least in part on operational capabilities and/or preferences at the receiving device 112."); *see also* '378 Patent at 2:54-58 ("[D]igital content elements may be identified based upon one or more preferences, capabilities, and/or configurations associated with a recipient or a corresponding receiving device as may be indicated by a message adaptation specification.").  This language clearly states that the selection need not be based on the operational capabilities of the receiving device and could be based on something else such as user preferences contained on the device.

United States District Court
For the Northern District of California

just two different digital content elements.  This is because under this standard, to understand the scope of the invention one must know with reasonable certainty when information is related to a particular product or service, and when it is related to something else, such as a different product.  In some contexts this may be clear, but in many areas this determination would be left to the subjective opinion of the person practicing the invention.  For example in the context of a car dealership, many people would agree that a Ford F-150 truck and a Ford F-250 truck are different products.  But, is a 4-door Ford F-150 a different product than a 2-door F-150?  Is an F-150 with a V6 engine a different product than an F-150 with a V8 engine?  Is an F-150 with 4-wheel drive different than an F-150 with 2-wheel drive? Some people would say yes to these questions, some would say no.  In sum, because the boundaries of the claims containing this term often depend on the on the unrestrained, subjective opinion of the person practicing the invention, Veeva has met its burden of proving by clear and convincing evidence that the claims at issue are indefinite.[4]  *See Datamize*, 417 F.3d at 1350.

Moreover, that this term renders the claims at issue indefinite is supported by Prolifiq's own briefing.  In its claim constructions briefs, Prolifiq does not offer any construction for this term even though it is clearly a term that does not have a plain and ordinary meaning that is readily apparent to a lay person.  Indeed, Prolifiq does not provide the Court with any meaningful definition for what this term precisely means, except to say in its reply brief that a corresponding plurality of differently versioned digital content element candidates are a "set of content element candidates that are different

---

[4] In addition, the Court finds unpersuasive Prolifiq's reliance on *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565 (Fed. Cir. 1986).  *Orthokinetics* involved a patent for an orthopedic wheelchair.  *Id.* at 1568.  All the claims of the patent at issue contained the following limitation: "wherein said front leg portion is *so dimensioned* as to be insertable through the space between the doorframe of an automobile and one of the seats thereof."  *Id.* at 1575 (emphasis added).  The Federal Circuit found that the claim term "so dimensioned" did not render the asserted claims invalid for indefiniteness.  *Id.* at 1576.  Although the precise meaning of the term "so dimensioned" would depend on the particular automobile selected, the Federal Circuit explained that this was not an issue because once the relevant automobile was selected, "one of ordinary skill in the art would easily have been able to determine the appropriate dimensions.  *Id.*  "The phrase 'so dimensioned' is as accurate as the subject matter permits, automobiles being of various sizes."  *Id.*
    The problem with Prolifiq's reliance on this case is that the patent in *Orthokinetics* did provide an objective standard for determining the scope of the term "so dimensioned."  Once a particular automobile was selected, the dimensions of that particular automobile provided a person skilled in the art with an objective standard for determining whether a device was within the scope of the claims.  In contrast, here, even if the relevant digital content elements are identified, such as specifying that they are a digital image of a dog and a digital image of a cat, it often will still be left to the unrestrained, subjective opinion of the person practicing the invention to determine whether the digital content elements are considered "differently versioned" in the context of the patents-in-suit.

United States District Court
For the Northern District of California

versions of each other." Docket No. 70 at 7. This circular definition provides no guidance as to what is actually meant by the claim term.[5] Further, Prolifiq has not articulated an objective standard that one could use to determine the scope of this claim term. Prolifiq simply identifies examples of "differently versioned" digital content elements contained in the specifications of the patents. Docket No. 56 at 16-18; Docket No. 70 at 8-10. But, as explained above, these examples are insufficient to show with reasonable certainty the scope of the claims because they provide no information as to what falls outside the boundaries of the claims. Prolifiq does not provide the Court with an example from the patents explaining not only when two digital content elements are different versions of each other, but also, and more importantly, when two digital content elements *are not* different versions of each other. Because the term "differently versioned" often relies on the unrestrained, subjective opinion of the person practicing the invention, the term does not provide one skilled in the art with reasonable clarity as to the scope of the invention. Accordingly, the Court holds that the claim term "differently versioned" renders asserted claims 13-16 of the '378 patent and asserted claims 3, 4, and 8 of the '556 patent invalid for lack of definiteness.[6]

---

[5] It is for this reason that the Court finds unpersuasive Prolifiq's reliance on *Bancorp Services, L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367 (Fed. Cir. 2004). In *Bancorp*, the Federal Circuit examined the claim term "surrender value protected investment credits for the life insurance policy" and determined that the term did not render the relevant claims indefinite. *Id.* at 1372-74. The Federal Circuit explained that "the term 'surrender value' has a clear meaning to one of ordinary skill in the relevant art," and that the specification and extrinsic evidence provide clear definitions for the terms "protected investments" and "credits." *Id.* at 1372. Thus, each component of the claim term had a clear definition and "[v]iewing these components of the claim term together," the Federal Circuit was able to decipher a reasonably clear definition for the term "surrender value protected investment credits." *Id.* In contrast, here, Prolifiq has failed to provide the Court with any clear definition for the term "differently versioned" or any clear definitions for the components of the term.

[6] Prolifiq argues that Veeva's indefiniteness argument is procedurally defective because Veeva has failed to provide the Court with expert testimony from one skilled in the art stating that this term fails to provide him with reasonable certainty as to the scope of the claims. Docket No. 56 at 12. The Court disagrees. Although expert testimony is generally helpful in determining whether a claim is indefinite, expert testimony is not always required to make that determination. *See, e.g.*, *Datamize*, 417 F.3d at 1348-55. This is particularly true where the issue is whether the claim term in light of the intrinsic record provides a subjective as opposed to objective standard for determining the scope of the invention. *See, e.g.*, *id.* The Court recognizes that definiteness must "be evaluated from the perspective of someone skilled in the relevant art." *Nautilus*, 134 S. Ct. at 2128. But, where a claim term allows the scope of the invention to be determined by the unrestrained, subjective opinion of the person practicing the invention, then no one, including a person skilled in the art, can determine with reasonable clarity the scope of the invention. *See Datamize*, 417 F.3d at 1350.

C.    "message adaptation specification"

| Plaintiff Prolifiq | Defendant Veeva |
|---|---|
| "a specification for automated definition of presentation alternatives for a given adaptive electronic message" | "mapping of the ways in which the form or content of a message will be added to, subtracted from, or substituted for" |

The parties first dispute whether the construction of this term should use the word "specification" or the word "mapping." Prolifiq argues there is no need to use a different word from the one that is already found in the claim language. Docket No. 56 at 19-20. The Court disagrees. A lay juror would more easily understand what is meant by the term "mapping" rather than the term "specification." Prolifiq admits that the word "mapping" is a reasonable approximation of the word "specification" in this context. *Id.* at 19. Accordingly, the Court's construction will use the word "mapping."

Prolifiq also argues that the Court's construction should include the word "automated." Docket No. 56 at 20. However, Prolifiq fails to identify any language in the claims or the specification of either patent requiring that the "message adaptation specification" be automated. Prolifiq argues that this language is necessary because the message adaptation specification is performed on a computer. *Id.* But, Veeva correctly argues that, even assuming this is true, a computer can allow for both automated and manual operations. Docket No. 67 at 13. Therefore, the Court declines to adopt a construction that requires that the "message adaption specification" be automated.

The parties next dispute whether the Court's construction of this term should state that the "message adaptation specification" can change both the form and the content of a message or just provide alternative presentations, which Prolifiq contends only relates to changing the form of a message. Docket No. 56 at 19; Docket No. 67 at 11-13; Docket No. 70 at 13-14. Prolifiq argues that it is only the form of the message that may be changed. Docket No. 56 at 19. However, the specification of the '556 patent provides: "embodiments of the present invention may provide for the adaptation of the <u>form and/or content</u> of the electronic message based on capabilities and/or preferences associated with the message recipient." '556 Patent at 2:35-38 (emphasis added); *see also* '378 Patent at 9:24-25 ("recipient-specific customization information may be added through the adaptation process"). "A claim construction that excludes the preferred embodiment 'is rarely, if ever, correct and would require highly persuasive evidentiary support.'" *Adams Respiratory Therapeutics*, 616 F.3d at

1290.  Prolifiq has failed to provide the Court with such support.[7]  Accordingly, the Court declines to

adopt a construction that limits the message adaptations to only the form of the message.

Finally, Veeva's proposed construction explaining that the message adaption specification can

add to, subtract from, or substitute for is supported by the specification of the '378 patent.  The patent

explains: "The term 'supplement' is broadly used herein to describe manners in which an electronic

message may be adapted."  '378 Patent at 3:48-50.  The specification goes on to state: "Thus,

supplementing can be an additive function, a subtractive function, or a substitutive function."  *Id.* at

3:62-64.  Accordingly, the Court construes the term "message adaptation specification" as "mapping

of the ways in which the form and/or content of a message will be added to, subtracted from, or

substituted for."[8]

## III.   The Remaining Disputed Terms From The '556 Patent

A.   "core-content candidates"

| Plaintiff Prolifiq | Defendant Veeva |
|---|---|
| "data that specifies, to the sender, the substance of an electronic message that can be created by the system/apparatus" | "optional subjects, each of which is directly related to information that the recipient is, or may be, interested in" |

Veeva's proposed construction requires that the "core-content candidates" be directly related

to information that the recipient is, or may be, interested in.  Docket No. 67 at 14.  To support its

proposed construction, Veeva relies on portions of the specification defining the terms "requested

content information" and the term "core content."  The specification provides:

> The construct information may include . . . requested content information, e.g.,
> information that is directly and/or indirectly related to content that the recipient is, or
> may be, interested in.  As used herein, content that the recipient is, or may be, interested
> in may [*sic*] also be referred to as "requested content."   . . .  Requested content

---

[7]  Prolifiq argues that Veeva's construction requires creating a different message with different substance.  Docket No. 56 at 19; Docket No. 70 at 4.  The Court disagrees.  A message can have some different content, but still contain the same overall substance.  For example, a message could be: "Tom, there is a sale on Tuesday," and another message could be: "Bill, there is a sale on June 17, 2014."  Both of these messages convey the same substantive message, but contain different words, i.e., different content.

[8]  The Court uses the words "and/or" rather than "or" in its construction to better reflect the language that is in the specification of the '556 patent.  *See* '556 Patent at 2:35-38.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

information directly related to the requested content could include, e.g., a request for information on a particular product and/or service (hereinafter collectively referred to as "core content"). Requested content information indirectly related to requested content could include, e.g., information on recipient's occupation, interests, hobbies, work address, home address, timeframe for making a purchase of products/services, etc. (hereinafter collectively referred to [as] "peripheral content").

'556 Patent at 2:55-3:5. Here, the specification provides clear definitions for the term "requested content information" and the term "core content." *See Phillips*, 415 F.3d at 1316 ("[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs."); *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365-66 (Fed. Cir. 2012). However, the problem with Veeva's argument is that the Court is not being asked to construe the term "requested content information" or the term "core content." The parties request that the Court construe the term "core-content candidates."

There is no language in the claims or the specification stating that "core-content candidates" must directly relate to information that the recipient is, or may be, interested in. Moreover, as Prolifiq correctly explains, a review of the claim language shows that a "core-content candidate" is different from "core content" and "requested content information" and that Veeva's proposed construction is illogical. *See Phillips*, 415 F.3d 1314 ("[T]he context in which a term is used in the asserted claim can be highly instructive."). For example, claim 1 states that "core-content candidates" are information associated with one or more products and/or services[9] for potential selection on the first network device. *See* '556 Patent at 11:15-19. The core content candidates are sent from the computer system to a first network device for potential selection. *See id.* at 11:15-27. Then, the requested content information based in part on the core content candidate or candidates that are selected is sent to the computer system from the first network device. *See id.* It is sensible that the "requested content information" is information directly related to content that the recipient is, or may be, interested in because the "requested content information" is based on the "core-content candidates" that have been selected and

---

[9] "As a general rule, the words 'a' or 'an' in a patent claim carry the meaning of 'one or more.' That is particularly true when those words are used in combination with the open-ended antecedent 'comprising.'" *TiVo, Inc. v. Echostar Communs. Corp.*, 516 F.3d 1290, 1303 (Fed. Cir. 2008) (citation omitted); *accord Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) ("That 'a' or 'an' can mean 'one or more' is best described as a rule, rather than merely as a presumption or even a convention.").

**United States District Court**
For the Northern District of California

that selection could be based on some form of information or input from the recipient.[10]  It does not make sense for the information to be already directly related to information that the recipient is interested in when it is first sent from the computer system because this would require that the computer system be prescient and know what information the recipient is interested in, or may be interested in, prior to the selection being made and having any form of input from the recipient.[11]  Accordingly, the Court declines to require that the "core-content candidates" be directly related to information that the recipient is, or may be, interested in.

The parties also dispute whether the "core-content candidates" must convey the substance of a message or just the subject of a message.  *See* Docket No. 56 at 9; Docket No. 67 at 15-16.  Veeva argues that core-content candidates are optional subjects that are presented to the user for selection. Docket No. 67 at 15.  In support of this argument, Veeva points to a portion of the specification describing a preferred embodiment that states: "The core-content candidates 312 may be selected from a list of, for example, products and/or services . . . ."  '556 Patent at 5:47-49.  But, it is improper to import limitations from preferred embodiments described in the specification into the claims absent a clear indication that the claims should be so limited.  *DealerTrack*, 674 F.3d at 1327.  Here, the specification fails to provide a clear indication that the claims should be so limited.  The specification states that these are examples of how the core-content candidates can be presented, not requirements for how they must be presented.  Therefore, the Court declines to construe this term to require that the core-content candidates be optional subjects that are presented to the user for selection.

Prolifiq argues that the core-content candidates must specify the substance and not merely the subject of the message.  Docket No. 56 at 9.  However, Prolifiq's proposed construction impermissibly

---

[10] The Court agrees with Prolifiq that it is at this point—when the core-content candidate has been selected—that the information changes from being a "core-content candidate" to "core content," becoming information that is directly related to a particular product or service that the recipient is, or may be, interested in.

[11] For example, an embodiment of this invention could assist in the sales of cars at a dealership that sells Chevrolet and Cadillac automobiles.  This dealership would likely deal with many customers who are only interested in potentially buying a Cadillac and have no interest at all in buying a Chevrolet, and vice versa.  Rather than simply providing the first network device with a list of the entire dealership's inventory, Veeva's proposed construction would require the computer system to know in advance what cars the customers might be interested in and send the network device a list of only those specific cars.

excludes a preferred embodiment described in the specification.  The specification of the '556 patent states: "The core-content candidates 312 may be selected from a list of, for example, products and/or services . . . ."  '556 Patent at 5:47-49.  Here, the core-content candidates are presented as simply a list of products and/or services, which would not convey the substance of the potential message.  Therefore, Prolifiq's proposed construction is improper, *see Adams Respiratory Therapeutics*, 616 F.3d at 1290 ("A claim construction that excludes the preferred embodiment 'is rarely, if ever, correct . . . .'"), and the Court declines to construe this term to require that the core-content candidates specify the substance of the message.

In sum, the Court declines to adopt either parties' proposed construction.  The claims merely require that "core-content candidates" be information that is related to products and/or services for potential selection.  There is no language in the claims or the specification requiring that the core-content candidates must provide the substance of a message or that they must provide the subject of a message.  Accordingly, the Court construes "core-content candidates" as "information related to one or more particular products and/or services for potential selection."

B.     "core-content selection"

| Plaintiff Prolifiq | Defendant Veeva |
|---|---|
| "a core-content candidate selected by the sender" | plain and ordinary meaning |

Veeva argues that no construction for this term is needed and that the term should be given its plain and ordinary meaning.  Docket No. 67 at 16-17.  Prolifiq agrees that it is not necessary to construe this term for the jury to understand it, but argues that the selection must be made by the sender.  Docket No. 56 at 11.  In response, Veeva argues that there is no requirement that the selection must be made by the sender.  Docket No. 67 at 16-17.  The Court agrees that this term should be given its plain and ordinary meaning and that the term does not need to be construed for it to be understood by the jury.  However, because the parties dispute the meaning and scope of this term, it is the Court's duty to adopt

United States District Court
For the Northern District of California

a construction that will resolve the parties' dispute. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1361-62 (Fed. Cir. 2008) ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate . . . when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute.")

The meaning of this term is evident from the plain language of the claims. *See Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."). A "core-content selection" is simply a core-content candidate or a group of core-content candidates that has been selected. *See* '556 Patent at 11:25-27 ("a core-content selection selected from the plurality of core-content candidates").

Prolifiq argues that the selection must be made by the sender. Docket No. 56 at 11. However, there is no language in the claims or the specification of the '556 patent requiring that the selection be made by the sender. The claim language merely requires that the selection be sent from the "first network device" and that the "first network device" is associated with a "sender." '556 Patent at 11:15-27. That the sender is associated with the first network device does not mandate that it is the sender who actually makes the selection on the device as opposed to, for example, the recipient making the selection. In support of its argument, Prolifiq relies on the following language in the specification: "The user interface 300 may include . . . a requested content information field 308, values for which may be input by an operator using one or more input devices." *Id.* at 5:35-38. But, this passage does not state that the "operator" must be the "sender." Moreover, even if the term "operator" in this passage is referring to the "sender," the passage states that the values may be input by the operator, not that they must be. Therefore, the Court declines to adopt a construction requiring that the selection be made by the sender. Accordingly, the Court construes the term "core-content selection" as "one or more core-content candidates that have been selected by the sender or someone or something else."

C.    "message creation specification"

| Plaintiff Prolifiq | Defendant Veeva |
| --- | --- |

| "a specification for automated creation of an electronic message" | Indefinite |
|---|---|

Veeva argues that this claim term renders all the asserted claims of the '556 patent invalid for indefiniteness. Docket No. 67 at 17-19. To support its contention that this term is indefinite, Veeva argues that the specification of the '556 patent fails to provide any detail as to the nature, operation, or contents of the message creation specification. Docket No. 67 at 17. The Court disagrees.

Both the claims and the specification of the '556 patent provide a reasonably clear description of the nature of the message creation specification: it is a specification that assists in the creation of the second message. *See* '556 Patent at 11:32-34 ("constructing the second electronic message . . . , based at least in part on the message creation specification"), 6:40-44 ("The message management node 404 may include a message creation specification 420 for directing creation of the derived message 124."). Further, the specification provides a reasonably clear explanation of how this is done. "The message generation specification may direct the generation of the electronic message 124 through providing associations between requested content information, received from the sending device 104, and message templates and content controlled and accessible by the message manager."[12], [13]   *Id.* at 3:12-17. Therefore, Veeva has failed to show by clear and convincing evidence that this claim term is indefinite.

---

[12]   Veeva argues that it is improper to rely on the specification's description of the "message generation specification" to determine the scope of the term "message creation specification." Docket No. 67 at 18. Veeva argues that under the doctrine of claim differentiation, "[t]here is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims." *Id.* (quoting *Tandon Corp. v. U.S. International Trade Com.*, 831 F.2d 1017, 1023 (Fed. Cir. 1987)). However, here, there is no claim differentiation problem because the term "message generation specification" is not contained in any of the claims of the '556 patent. The claims only use the term "message creation specification." Moreover, it is clear from the specification of the '556 patent that the "message generation specification" is synonymous with the "message creation specification" because the specification uses the words "generation" and "creation" interchangeably. *See, e.g.*, '556 Patent at 3:12-13, 4:4-5, 7:65-8:3, 8:7-8:11.

[13] To the extent Veeva argues that this disclosure is insufficient to explain to someone of skill in the art how the "message creation specification" actually works, its argument appears not to relate to indefiniteness but rather to enablement, which is not properly before the Court at the *Markman* stage. *Cf. Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.*, 743 F.3d 1359, 1368-69 (Fed. Cir. 2014) ("Under the enablement requirement of 35 U.S.C. § 112, 'the specification must enable one of ordinary skill in the art to practice the claimed invention without undue experimentation.'").

United States District Court
For the Northern District of California

Prolifiq's proposed construction is consistent with how the term is used in the claims and the specification. Accordingly, the Court construes "message creation specification" as "a specification for automated creation of an electronic message."

D.      "corresponding plurality" and "corresponding number"

| Plaintiff Prolifiq | Defendant Veeva |
|---|---|
| Not Indefinite; No construction necessary | Indefinite |

Veeva argues that these two terms render claims 3, 4, and 8 of the '556 patent invalid for indefiniteness. Docket No. 67 at 19-20. Because the Court has already found claims 3, 4, and 8 invalid for indefiniteness based on the term "differently versioned," *see supra* section II.B, Veeva's arguments related to these two terms are MOOT.

IV.      **The Remaining Disputed Terms From The '378 Patent**

A.      "message adaption component"

| Plaintiff Prolifiq | Defendant Veeva |
|---|---|
| "programming logic implementing (a) message adaptation specification(s)" | "programming logic designed to add to, subtract from, or substitute for the form or content of a message" |

The parties agree that the construction of this term is resolved by the Court's construction of the term "message adaptation specification." Docket No. 56 at 22; Docket No. 67 at 20-21. Accordingly, the Court construes the term "message adaptation component" as "programming logic designed to add to, subtract from, or substitute for the form and/or content of a message."

B.      "message layer"

| Plaintiff Prolifiq | Defendant Veeva |
|---|---|
| "a presentation alternative for a given adaptive electronic message" | "presentation linking and/or embedding one or more media objects" |

United States District Court
For the Northern District of California

The parties first dispute whether the construction for this term should use the word "presentation" or the phrase "an alternative presentation."[14]  Veeva argues that the specification of the '378 patent expressly teaches that a layer is a type of presentation.  Docket No. 67 at 21-22.  However, the portions of the specification that Veeva cites to describe the layers as "alternative presentations" not just as "presentations."  The specification states: "layer definition 120 includes specifications for three layers (layer 1, layer 2, and layer 3), each defining an <u>alternative presentation</u> for at least one content cell of an adaptive electronic message."  '378 Patent at 5:7-10; *see also id.* at 4:37-41 ("[M]essage adaptation specification 106 may include a message layer definition to define <u>alternative presentations</u> or layers for a given adaptive electronic message, where each presentation may represent a different combination of digital content element candidates.").  Accordingly, the Court's construction of this term will use the phrase "an alternative presentation."[15]

Veeva argues that the Court's construction should include the requirement of "linking and/or embedding."  Docket No. 67 at 22.  In support of this proposed construction, Veeva relies on descriptions of preferred embodiments described in the specification.  *Id.* (citing '378 Patent at 3:65-4:6).  "'[I]t is improper to read limitations from a preferred embodiment described in the specification-even if it is the only embodiment-into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.'"  *DealerTrack*, 674 F.3d at 1327.  The portions of the specification cited by Veeva do not provide such a clear indication.  Rather, the specification states that the "digital content elements <u>may</u> be linked . . . or <u>may</u> be embedded . . . ."  '378 Patent at 3:65-67 (emphasis added).  Moreover, Veeva's proposal would exclude a preferred embodiment.  The specification describes an embodiment where the base electronic message contains only text elements.  *See id.* at 3:50-51.  Here, this base electronic message would be a layer without any linked or embedded content.  "A claim construction that excludes the preferred embodiment 'is rarely,

---

[14]  In its opening brief, Prolifiq argued that the construction for this term should include the phrase "presentation alternatives."  Docket No. 56 at 21.  In its reply brief, Prolifiq states that, in light of Veeva's objections, it agrees to revise its proposed construction to include the phrase "an alternative presentation" rather than "presentations alternatives."  Docket No. 70 at 14.

[15]  Indeed, although the construction of this term was not argued by the parties at the *Markman* hearing, a review of Veeva's claim construction presentation shows that it revised its proposed construction to use the term "alternative presentation."

if ever, correct and would require highly persuasive evidentiary support.'" *Adams Respiratory Therapeutics*, 616 F.3d at 1290.  Therefore, the Court declines to adopt the requirement of "linking and/or embedding."  Accordingly, the Court construes "message layer" as "an alternative presentation for a given adaptive electronic message."

## **CONCLUSION**

For the foregoing reasons and for good cause shown, the Court adopts the constructions set forth above.

**IT IS SO ORDERED.**

Dated: August 6, 2014                                                    _____
                                                                                        SUSAN ILLSTON
                                                                                        United States District Judge